Edward Goodell, J.
The interesting legal question raised by this small claim is whether a tenant under an oral lease is entitled to be reimbursed by his landlord for materials furnished and labor performed by the tenant in connection with the plastering and painting of two rooms in his apartment under the following circumstances:
The plaintiff lives in a tenement house located at 423 East 115th Street in the East Harlem section of Manhattan. Included among the occupants of the apartment are the plaintiff’s two children, both very young.
The record establishes that the plaster and paint in one of the .rooms and in the toilet were flaking off the walls; that the *938 plaintiff’s children were eating the plaster and paint flakes; that the plaintiff made complaint to the landlord, the defendant in this case, about this condition; and that when the defendant did nothing about the complaint, the plaintiff purchased plaster and paint and replastered and repainted the offending walls.
The plaintiff testified that the cost of the materials purchased by him was $29.53 and that the balance of his claim, approximately $70, is for his labor.
The landlord did not controvert any of the plaintiff’s testimony. It rested on the plaintiff’s case.
The issue here, in the light of the uncontested facts, is whether a recovery by the plaintiff is barred as a matter of law in view of the common-law rule that the landlord, in the absence of an express covenant, is not obligated to repair or paint. (Altz v. Leiberson, 233 N. Y. 16, 17; Davar Holdings v. Cohen, 255 App. Div. 445, mot. for rearg. den. 256 App. Div. 806, affd. 280 N. Y. 828; Emigrant Ind. Sav. Bank v. 108 W. 49th St. Corp., 255 App. Div. 570; Rubinger v. Del Monte, 217 N. Y. S. 2d 792.)
While statutory duties to repair and paint have been imposed upon the owner by sections 78 and 80 respectively of the Multiple Dwelling Law, it has been held that these duties are enforceable by the municipality only and, therefore that neither is the basis of a claim by the lessee against the lessor for reimbursement of the cost of repairs made by the lessee. (Emigrant Ind. Sav. Bank v. 108 W. 49th St. Corp., supra; Davar Holdings v. Cohen, supra.)
A trend in the opposite direction is indicated by several sources, the most recent of which is the decision of the Supreme Court of New Jersey in Marini v. Ireland, decided May 18, 1970.
In that case the defendant was a tenant of an apartment in a two-family duplex building under a written lease for one year. The litigation developed after the tenant discovered in June, 1969 that the toilet in his apartment was cracked and that water was leaking onto the bathroom floor. Following repeated unsuccessful attempts to inform the plaintiff of this condition, the defendant hired a registered plumber to repair the toilet and paid him for his work $85.72. The tenant then mailed the plaintiff a check for $9.28 together with the receipt for $85.72 in payment of the July, 1969 rent of $95. The plaintiff challenged the offset, demanded the outstanding $85.72 and when this was refused, instituted a summary dispossess proceeding for nonpayment of rent. The plaintiff’s position in that proceeding was that he had no obligation to repair and, *939 consequently, that the defendant’s payment of the repair could not be offset against the rent.
The New Jersey Supreme Court predicated its reversal of the judgment in the plaintiff’s favor on the theory that “in a modern setting, the landlord should, in residential letting, be held to an implied covenant against latent defects, which is another manner of saying habitability and living fitness ” and that “it is a mere matter of semantics whether we designate this covenant one ‘ to repair ’ or ‘ of habitability and liability fitness. ’ ”
The line of reasoning by which the court reached its conclusion in Marini v. Ireland is interesting in that it represents acceptance of the idea that the law of landlord and tenant, established in the course of a rural society, requires modification so that it can deal adequately with the realities of modern urban living. Central to this approach is the application of guidelines drawn from the law of contracts to the rigid concept of a lease as strictly a conveyance of an interest in real estate. Under this analysis the landlord’s covenant to repair and the tenant’s covenant to pay rent are mutually dependent instead of independent covenants and the rule that no warranties are implied is changed so that there is an implied warranty of habitability. (See in this connection Pines v. Perssion, 14 Wis. 2d 590; 6 Williston, Contracts [3d ed.], 890 A, p. 592; and the articles by Thomas M. Quinn and Earl Phillips entitled Law of Landlord-Tenant: Evaluation of the Past and Guideline for Future in the Fordham Law Review for December 1969 [38 Fordham L. Rev. 225], reprinted in the New York Law Journal on May 12, 13, 14 and 15, 1970, particularly the authorities cited in note 74 of those articles.)
More than 30 years have elapsed since the New York cases noted above, applicable to the issue in this case, were decided. During that period drastic changes have occurred in the housing situation. Deterioration and abandonment have become critical and the shortage of apartments is so acute that the defense of constructive eviction, insofar as it requires abandonment, is largely illusory. In the light of these changes the reasoning for the rule stated in Marini v. Ireland, becomes persuasive but this court, of course, is constrained to follow the applicable New York precedents.
However, there is a material difference in the facts in the instant case that distinguish it from the cases heretofore decided in New York and which, in my view, support a result in this case similar to the result in Marini v. Ireland but upon a different principle.
*940 The distinguishing fact situation here is that it involves the ingestion by children of flaking plaster and paint from the walls of a tenement house in the East Harlem section of Manhattan.
The court takes1 judicial notice of the facts, now notorious and a matter of common knowledge in New York City, that in New York City slum apartments “ as successive layers of paint peel away, the paint underneath becomes a menace to any young child who can pick off the flakes and put them in his mouth ’ ’ (New York Post, May 15, 1970,. p. 6); such plaster and paint contain lead; that lead poisoning is limited mainly to the children of the poor in New York City; and that the eating of such plaster and paint flakes by children leads to lead poisoning with the consequences of mental retardation and death (see New York Times, March 26, 1970 ; New York Times, June 12, 1970, p. 20; New York Times, June 14, 1970, p. 55; New York Post, June 19, 1970).
The New Yorh Times of March 26, 1970 reports a finding by scientists who attended a conference at Rockefeller University the preceding day that ‘1 lead poisoning, which is called the ‘ silent epidemic ’ that ‘ no one wants to talk about ’ affects from 5 to 10% of all children who live in America’s dilapidated pre-World War II housing units ” and that it affects 25,000 to 35,000 children in New York City each year. The New Yorh Post of June 19,. 1970 reports that out of 435 children tested in a crash program in the Bronx 40 were found to have lead poisoning, eight of whom were pronounced “ extremely serious.”
As a result of this condition Mayor Lindsay signed a bill on June 11, 1970 permitting landlords to deduct from their real estate taxes three-fourths of the cost of removing or boarding over lead-based paint in their buildings (see New Yorh Times, June 12, 1970, p. 20). And on June 14, 1970 Governor Rockefeller announced that the State Department of Health was planning a program to detect lead poisoning in children and to remove potential sources of the poisoning under a new State law. That law (L. 1970, ch. 338) adopted May 1, 1970 effective immediately as to part and as to the balance on September 1, 1970, .contains the following legislative finding: ‘ ‘ The occurrence of the disease of lead .poisoning in children has become a major public health concern. Severe lead poisoning cases result in death or mental retardation. It is estimated that children in our nation with abnormally high blood levels of lead number in the hundreds of thousands. Many thousands of children in the cities of our state are actual or potential victims of lead poisoning. The disease of lead poisoning is most prevalent in areas of old and deteriorating housing where leaded paint and *941 plaster in a peeling condition is accessible for ingestion by young children. ’ ’
This, therefore, is not a case involving painting for the sake of comfort or enjoyment of the premises. It is different and more than that. It concerns a situation of emergency and menace to the health and life of children.
The practical question that faced the plaintiff, a father of small children, in December, 1969 and January, 1970, prior to the adoption of the city and State legislation referred to above, was whether he was bound to sit by and do nothing despite the landlord’s inactivity and the delays of a municipality beset by a multiplicity of problems and conflicting demands for its attention or whether he should take prompt steps to prevent irreparable damage to his children and charge the cost to his landlord.
In these circumstances, in my view, the plaintiff had the right to remove the menace to the health and life of his children and to charge the cost, to the extent hereafter noted, to the landlord, for the following reasons:
While it has been held, as noted, that despite sections 78 and 80 of the Multiple Dwelling Law, the making of repairs by a tenant, does not entitle the tenant to reimbursement from the landlord in the absence of an express covenant by the landlord, the landlord is nevertheless liable for injuries suffered by the tenant or members of his family as a result of the landlord’s failure to make repairs (See Weiner v. Leroco Realty Corp., 279 N. Y. 127; Altz v. Leiberson, 233 N. Y. 16; Benjamin v. Woodner Co., 22 A D 2d 68; Moore v. Bryant, 27 Misc 2d 22; see, also, in this connection, Susskind v. 1136 Tenants Corp., 43 Misc 2d 588; Rubinger v. Del Monte, 217 N. Y. S. 2d 792, supra).
For want of a more accurate word, this dichotomy between tort and contract liability is stated in Rubinger v. Del Monte (supra) in this language: “While Multiple Dwelling Law Section 78 imposes the duty to make repairs on the landlord, so that the landlord is liable in tort and may be subject to penalties at the instance of public authorities, the statute does not affect the contract between the parties to a lease or forbid a provision therein permitting the tenant to make repairs ”.
Thus in Weiner v. Leroco Corp. (supra) an owner was held to be liable to the tenant of a tailor shop located on the street level of an apartment house for injuries sustained by the tenant by reason of a defective step on a stairway leading from the street level to the basement of the apartment house. Again in Altz v. Leiberson (233 N. Y. 16, 19, supra) involving a statutory provision similar to section 78 of the Multiple Dwelling Law, *942 the landlord was held liable to the tenant for injuries sustained as the result of a falling ceiling in the tenant’s apartment. In that case, Judge Cabdozo concluded his opinion with the following observation: “We may be sure that the framers of this statute, when regulating tenement life, had.uppermost in thought the care of those who are unable to care for themselves. The legislature must have known that unless repairs in the rooms of the poor were made by the landlord, they would not be made by any one. The duty imposed became commensurate with the need. The right to seek redress is not limited to the city or its officers. The right extends to all whom there was a purpose to protect ’ ’.
It cannot be said now, with positiveness, what the result might have been had the condition .in the plaintiff’s apartment continued unchanged and his children had suffered from 11 the silent epidemic”. It does seem fair to conclude, however, that had the condition continued unchanged, after notification had been given to the defendant,, as testified to by the plaintiff, and had the plaintiff’s children become, as a result, the victims of lead poisoning, that in those events a tort action might have been instituted by the plaintiff on behalf of his children and himself to recover damages for the resultant injuries suffered. As stated in Collins v. Noss (258 App. Div. 101, 102) as follows: “ The requirement of the statute (Multiple Dwelling Law, § 78) is not to render the landlord an insurer or make the premises absolutely safe for any purpose for which they might possibly be used, but only reasonably safe for the purpose for which they were intended to be used, or which the landlord should reasonably anticipate. Liability for actionable negligence must lie within the range of natural and probable consequences ’ ’.
"While the particular circumstances in Collins v. Noss were unusual and reasonably unforeseeable, the consequence of inaction in the present case were reasonably foreseeable and reasonably predictable. Just as- in the case of a falling ceiling or a defective step, so the defendant could foreseeably have been exposed to a tort action for damage had the plaintiff’s children suffered the result of continuing ingestions of plaster and paint because of the defendant’s failure to act after notice and demand for action.
The plaintiff, therefore, by his act, prevented the commission of an actionable tort that might have resulted from inaction.
If damage based upon the commission of a tort is an appropriate award, then in my view, it is proper and desirable to reimburse a plaintiff for the reasonable cost of preventing or averting the commission of a tort after a defendant has had a *943 reasonable opportunity to act and failed to do so in circumstances calling for action on Ms part. As Prosser has said in Ms discussion of ‘ ‘ prevention ”: “ The ‘ prophylactic ’ factor of preventing future harm has been quite important in the field of torts. * * * While the idea of prevention is seldom controlling, it very often has weight as a reason for holding the defendant responsible”. (Prosser, Torts [3d ed.], p. 23.)
In the circumstances of this case involving the concurrent conditions of an immediate threat to the health and life of children and a critical shortage of housing, it is my view that the prevention of an actionable tort by the plaintiff warrants his reimbursement for the cost of materials and the reasonable value of labor applied to the accomplishment of that result.
The question then is the amount of reimbursement.
I find that the cost of materials purchased by the plaintiff amounted to $29.53 and that this amount is reasonable.
Insofar as the plaintiff’s claim of $70' for his labor is concerned it appears that the plaintiff is neither a painter nor a plasterer. The rule is that “ A plaintiff seeking compensatory damages has the burden of proof and should present to the court a proper basis for ascertaining the damages he seeks to recover. ” (Dunkel v. McDonald, 70 N. Y. S. 2d 653, 656.) Nevertheless, although the standards that would be utilized in the case of a professional painter or plasterer are not applicable here, the court is not prevented by that circumstance from determining by some other practical method the measure of damage. As the court said in Dunkel v. McDonald (supra, pp. 656-657): “ However, where it i's certain that damages have been caused by a wrong and the only uncertainty is as to the amount, there can be no good reason for refusing on account of such uncertainty any damages for the wrong. * * * A wrongdoer may not escape liability simply because there are not available the ordinary standards for proving damages. The law will resort to some practical means that will be just to the parties.”
There is a practical standard to be applied in determining the reasonable value of the plaintiff’s labor. The court takes judicial notice of the fact that in December 1969 the minimum wage for unskilled labor, both Federal and State, was $1.60 an hour. I find that the reasonable amount of time for the performance of this work was 10 hours.
Accordingly, in the interest of doing substantial justice, judgment is awarded in favor of the plaintiff and against the defendant for the sum of $45.53 with interest thereon from February 17, 1970.