405 A.2d 897

**J. C. PUGH, Appellant,**

v.

**Eloise P. HOLMES, Appellee.**

Supreme Court of Pennsylvania.

Argued April 19, 1979.

Decided July 6, 1979.

Reargument Denied Aug. 15, 1979.

Stephen E. Patterson, Waynesboro, for appellant.

David R. Woodward, Chambersburg, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, MANDERINO and LARSEN, JJ.

## OPINION

LARSEN, Justice.

Eloise Holmes, appellee, had been, pursuant to an oral month-to-month lease, renting a residential dwelling in Chambersburg in Franklin County at the rate of $60.00 per month from November, 1971 until recently. Her landlord, appellant J. C. Pugh, instituted two separate landlord-tenant actions against appellee before a justice of the peace, the first resulting in a judgment for unpaid rent (for the period from September, 1975 through June, 1976) and the second resulting in a judgment for unpaid rent (for the period from June, 1976 through August, 1976) and for possession of the premises. Following Mrs. Holmes' appeals to the Court of Common Pleas of Franklin County, appellant filed separate complaints, the first seeking unpaid rent and the second

seeking both unpaid rent and possession. In both actions, appellee filed answers asserting a defense of the landlord's alleged breach of an implied warranty of habitability. Additionally, in the second action, appellee asserted a setoff due in an amount which she claimed she had spent to repair a broken lock after having given appellant notice and a reasonable opportunity to repair the lock. Appellee also filed a counterclaim for the cost of repairing other allegedly defective conditions of which she had given appellant notice. Appellant filed preliminary objections to the answer and counterclaim which the Court of Common Pleas sustained finding that appellee's answer failed to set forth a legal defense to the landlord's actions, and that the counterclaim failed to set forth a legal cause of action.

On appeal, the Superior Court, by opinion of President Judge Jacobs, reversed and remanded. The Superior Court abolished the doctrine of *caveat emptor* as applied to residential leases and held that a warranty of habitability by the landlord will be implied in all such leases, which implied warrant would be mutually dependent upon the tenant's obligation to pay rent. *Pugh v. Holmes,* 253 Pa.Super. 76, 384 A.2d 1234 (1978) (Price, J. dissenting). By order dated July 20, 1978, this Court granted appellant's petition for allowance of appeal.

## I. DOCTRINE OF CAVEAT EMPTOR ABOLISHED/IMPLIED WARRANTY OF HABITABILITY ADOPTED

The doctrine of *caveat emptor* comported with the needs of the society in which it developed. However, we find that the doctrine of *caveat emptor* has outlived its usefulness and must be abolished, and that, in order to keep in step with the realities of modern day leasing, it is appropriate to adopt an implied warranty of habitability in residential leases. The rule of *caveat emptor,* as applied to landlord-tenant relationships, developed in England in the sixteenth century and was adopted in the nineteenth century as the law of this Commonwealth in *Moore v. Weber,* 71 Pa. 429 (1872). *Moore* held "The rule here, as in other cases, is *caveat emptor.* The lessee's eyes are his bargain. He is

bound to examine the premises he rents, and secure himself by covenants to repair." *Id.* at 432. In the primarily agrarian society in which the doctrine developed, the law viewed the lease transaction as a conveyance of land for a term, and the focal interest in the conveyance was the land—any shelters or structures existing on the land were "incidental" concerns. The rent was viewed as "coming out of the land" itself, not from the dwelling or the dweller. The feudal landlord

"had no obligations to the tenant other than those made expressly, and the tenant's obligation to pay rent was independent of the landlord's [covenants] . . . The doctrine of *caveat emptor* was fully applicable. The tenant's only protections were to inspect the premises before taking possession or to extract express warranties from the landlord. It was assumed that landlords and tenants held equal bargaining power in arranging their rental agreements, and that the agrarian tenant had the ability to inspect the dwelling adequately and to make simple repairs in the buildings which possessed no modern conveniences such as indoor plumbing or electrical wiring. As agrarian society declined and population centers shifted from rural to urban areas, the common law concepts of landlord-tenant relationships did not change. Despite the facts that the primary purpose of the urban leasing arrangement was housing and not land and that the tenant could neither adequately inspect nor repair urban dwelling units, landlords still were not held to any implied warranties in the places they rented and tenants leased dwellings at their own risk."

*Pugh v. Holmes,* 253 Pa. 80, 384 A.2d at 1237–38.[1]

As stated by appellee, "times have changed. So has the law." (Brief for appellee at 3). Today, the doctrine of the

1. For judicial analysis of the historical context in which the property view of the landlord-tenant relationship developed, *see* cases cited in *Pugh v. Holmes,* 253 Pa.Super. 82, 384 A.2d at 1237, n. 2. *See also* 2 F. Pollock and F. Maitland, *The History of English Law* 131 (2d ed. 1923); 2 R. Powell, *The Law of Real Property* § 225(2) (P. Rohan rev.

implied warranty of habitability has attained majority status in the United States, the doctrine having been embraced by the appellate courts and/or the legislatures of some 40 state jurisdictions and the District of Columbia.[2] The war-

1975); Restatement (Second) of Property, Landlord and Tenant § 5.1, Reporter's Note 2.

2. *Alaska*—Alaska Stat. §§ 34.03.100, 34.03.160, 34.03.180 (1974); *Arizona*—Ariz.Rev.Stat.Ann. §§ 33–1324 and 33–1361 (1974); *California*—Cal.Civ.Code §§ 1941, 1942 (West 1974), and *Green v. Superior Court,* 10 Cal.3d 616, 111 Cal.Rptr. 704, 517 P.2d 1168 (1974); *Connecticut*—Conn.Gen.Stat.Ann. §§ 47–24 *et seq.* (1960), and *Todd v. May,* 6 Conn.Cir.Ct. 731, 316 A.2d 793 (1973); *Delaware*—Del. Code Ann. tit. 25, § 5303 (1974); *District of Columbia—Javins v. First National Realty Corp.,* 138 U.S.App.D.C. 369, 380, 428 F.2d 1071, 1082 *cert. denied,* 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970); *Florida*—Fla.Stat.Ann. §§ 83.51, 83.56 (1973); *Georgia*—Ga. Code Ann. tit. 61, Sections 111–112; *Givens v. Gray,* 126 Ga.App. 309, 190 S.E.2d 607 (1972); and *Stack v. Harris,* 111 Ga. 149, 36 S.E. 615 (1906); *Hawaii*—Haw.Rev.Stat. § 521–42 (Supp.1974), and *Lemle v. Breeden,* 51 Haw. 426, 462 P.2d 470 (1969); *Idaho*—Idaho Code § 6–316 (H.B. No. 34, 1977); *Illinois—Jack Spring Inc. v. Little,* 50 Ill.2d 351, 280 N.E.2d 208 (1972); *Indiana—Old Town Development Company v. Langford,* Ind.App., 349 N.E.2d 744 (1976); *Iowa— Mease v. Fox,* 200 N.W.2d 791 (Iowa 1972); *Kansas—Steele v. Latimer,* 214 Kan. 329, 521 P.2d 304 (1974); *Kentucky*—Ky.Rev. Stat.Ann. §§ 383.595, 383.625 (Supp.1974); *Maine*—Me.Rev.Stat. Ann. tit. 14, § 6021 (Supp.1974); *Maryland*—Md.Real Prop.Code Ann. § 8–211 (Cum.Supp.1975), superseded in their respective jurisdictions by Baltimore City Public Local laws §§ 9–9, 9–10, 9–14.1 (eff. July 1, 1971), and Montgomery County Code, Fair Landlord-Tenant Relations, ch. 93A (Nov. 21, 1972); *Massachusetts*—Mass.Gen. Laws Ann. ch. 239, § 8A (Supp.1974), and *Boston Housing Authority v. Hemingway,* 363 Mass. 184, 293 N.E.2d 831 (1973); *Michigan* —Mich.Comp.Laws Ann. § 554.139 (Supp.1974), and *Rome v. Walker,* 38 Mich.App. 458, 196 N.W.2d 850 (1972); *Minnesota*—Minn. Stat. § 504.18 (1974), *applied in Fritz v. Warthen,* 298 Minn. 54, 213 N.W.2d 339 (1973); *Missouri—King v. Moorehead,* 495 S.W.2d 65 (Mo.App.1973); *Montana*—Mont.Rev.Codes § 42–420 (1978); *Nebraska*—Neb.Rev.Stat. §§ 76–1419, 76–1425 *et seq.* (Cum.Supp. 1974); *Nevada*—Nev.Rev.Stat. tit. 10 § 118A.290 (1977) (but note that the Act does *not* protect tenants whose landlord owns fewer than seven units); *New Hampshire—Kline v. Burns,* 111 N.H. 87, 276 A.2d 248 (1971); *New Jersey—Marini v. Ireland;* 56 N.J. 130, 265 A.2d 526 (1970); *New Mexico*—N.M.Stat. §§ 70–7–1 *et seq.; New York—Amanuensis, Ltd. v. Brown,* 65 Misc.2d 15, 318 N.Y.S.2d 11 (N.Y.Cir.Ct.1971); N.Y. Real Prop. Law § 235–b (McKinney 1972), *as adopted in* ch. 597, [1975] N.Y. Acts 875; *North Carolina*—ch. 770, Session Laws, 1977–78 (N.C.G.S., ch. 42, art. V); *North Dakota* —N.D.Cent.Code § 47–16–13.1 *et seq.* (1977); *Ohio—Glyco v. Schultz,* 35 Ohio Misc.2d 25, 62 Ohio Op.2d 459, 289 N.E.2d 919

ranty recognizes that the modern tenant is not interested in land, but rather bargains for a dwelling house suitable for habitation.

"Functionally viewed, the modern apartment dweller is a consumer of housing services. The contemporary leasing of residences envisions one person (landlord) exchanging for periodic payments (rent) a bundle of goods and services, rights and obligations. The now classic description of this economic reality appears in *Javins v. First National Realty Corp.*, 138 U.S.App.D.C. 369, 428 F.2d 1071, 1074, *cert. denied,* 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970) (footnote omitted). When American city dwellers both rich and poor, seek 'shelter today, they seek a well known package of goods and services—a package which includes not merely walls and ceilings, but also adequate heat, light and ventilation, serviceable plumbing facilities, secure windows and doors, proper sanitation, and proper maintenance.' "

*Commonwealth v. Monumental Properties, Inc.,* 459 Pa. 450, 467–68, 329 A.2d 812, 820–21 (1974) (holding Unfair Trade Practices and Consumer Protection Law applicable to residential leases.)

Moreover, prospective tenants today can have vastly inferior bargaining power compared with the landlord, as was recognized in *Reitmeyer v. Sprecher,* 431 Pa. 284, 243 A.2d 395 (1968). In *Reitmeyer* this Court stated:

(Mun.Ct.Ohio 1972), and Ohio Rev.Code Ann. §§ 5321.04, 5321.07 (Page Supp.1974); *Oklahoma*—Okla.Stat. tit. 41 § 118 (1978); *Oregon*—Or.Rev.Stat. §§ 91.770, 91.800–.815 (1974); *Rhode Island* —R.I.Gen.Laws § 34–18–16 (1968); *Tennessee*—Tenn.Code Ann. §§ 64–2801 *et seq.* (1974); *Texas—Kamarath v. Bennett,* (Tex.1978), 568 S.W.2d 658 (1978); *Vermont*—Vt.Stat.Ann. tit. 12, § 4859 (1972) (remedy limited to affirmative defenses only); *Virginia*—Va.Code Ann. §§ 55–248.13, 55–248.25 (Cum.Supp.1975); *Washington* —Wash.Rev.Code Ann. § 59.18.060 (Supp.1974), and *Foisy v. Wyman,* 83 Wash.2d 22, 515 P.2d 160 (1973); *West Virginia*—H.B. 1368 (passed March 11, 1978; effective date, June 11, 1978) (sets out landlord obligations but does not provide remedy for breach); *Wisconsin—Pines v. Perssion,* 14 Wis.2d 590, 111 N.W.2d 409 (1961); *but see Posnanski v. Hood,* 46 Wis.2d 172, 174 N.W.2d 528 (1970) and *Blackwell v. Del Bosco,* Colo., 558 P.2d 563 (1976). Brief for Amicus Curiae, National Housing Law Project, 1–2, n. 1.

"Stark necessity very often forces a tenant into occupancy of premises far from desirable and in a defective state of repair. The acute housing shortage mandates that the average prospective tenant accede to the demands of the prospective landlord as to conditions of rental, which, under ordinary conditions with housing available, the average tenant would not and should not accept.

No longer does the average prospective tenant occupy a free bargaining status and no longer do the average landlord-to-be and tenant-to-be negotiate a lease on an 'arm's length' basis."

*Id.,* 431 Pa. at 289–90, 243 A.2d at 398.

The Superior Court correctly observed that to join the trend toward an implied warranty of habitability would not be a complete and sudden break with the past, but would be the "next step in the law which has been developing in the Commonwealth for a number of years." 253 Pa.Super. at 85, 384 A.2d at 1239. Pennsylvania courts have held that a tenant's obligation to pay rent was mutually dependent on *express* covenants of a landlord to repair and that a material breach of the landlord's covenant to repair relieved a tenant from his obligation to pay rent. *McDanel v. Mack Realty Company,* 315 Pa. 174, 172 A. 97 (1934). In *Reitmeyer v. Sprecher, supra,* recognizing the contractual nature of modern leasing and the severe housing shortage resulting in unequal bargaining power, this Court adopted § 357 of the Restatement (Second) of Torts and imposed liability on a landlord who had breached a covenant to repair a dangerous condition on the premises, which breach resulted in injury to the tenant. In *Elderkin v. Gaster,* 447 Pa. 118, 288 A.2d 771 (1972), we abolished *caveat emptor* and adopted an implied warranty of habitability in sales of new homes to buyers by vendors/builders. In *Elderkin* we noted *"caveat emptor* developed when the buyer and seller were in an equal bargaining position and they could readily be expected to protect themselves in the deed. . . . 'The *caveat emptor* rule as applied to new houses is an anachronism patently out of harmony with modern home buying practices.'" *Id.,* 447 Pa. at 127–28, 288 A.2d at 776 (citations omitted).

In 1974, *Commonwealth v. Monumental Properties, Inc.,* *supra,* we held the Unfair Trade Practices and Consumer Protection Law, Act of December 17, 1968, P.L. 1224, §§ 1–9, 73 P.S. §§ 201–1 to 201–9 (1971), applicable to residential leases, primarily because of the functional, contractual view of modern leasing and the housing crises in the Commonwealth. *Id.,* 459 Pa. at 467, 474–77, 824, 329 A.2d at 820–21, 824. The inferior bargaining position of some tenants caused by the housing shortage made the protection of these consumer laws necessary. Similarly, consumers of goods have received the protections of the implied warranties of merchantability and fitness for a particular purpose since 1953. Uniform Commercial Code, Act of April 6, 1953 P.L. 3, §§ 2–314, 2–315, *as reenacted,* Act of October 2, 1959, P.L. 1023, § 2, 12A P.S. §§ 2–314, 2–315 (1970).

More recently we held that a lessee of commercial property is relieved from the obligation to pay rent when the leased premises are destroyed by fire. *Albert M. Greenfield & Co., Inc. v. Kolea,* 475 Pa. 351, 380 A.2d 758 (1977). This Court stated "In reaching a decision involving the landlord-tenant relationship, too often courts have relied on outdated common law property principles and presumptions and have refused to consider the factors necessary for an equitable and just conclusion. . . . Buildings are critical to the functioning of modern society. When the parties bargain for the use of a building, the soil beneath is generally of little consequence. Our laws should develop to reflect these changes." *Id.,* 475 Pa. at 356–57, 380 A.2d at 760.

Given the foregoing considerations and authority, we affirm the Superior Court's holding that a lease is in the nature of a contract and is to be controlled by principles of contract law. The covenants and warranties in the lease are mutually dependent; the tenant's obligation to pay rent and the landlord's obligation imposed by the implied warranty of habitability to provide and maintain habitable premises are, therefore, dependent and a material breach of one of these obligations will relieve the obligation of the other so long as the breach continues.

## II. ADOPTION OF IMPLIED WARRANTY OF HABITABILITY: A PROPER JUDICIAL FUNCTION

■ Appellant does not argue that an implied warranty of habitability does not comport with current understanding of the landlord-tenant relationship. In light of the overwhelming authority in favor of the warrant, he would be hard pressed to do so. Rather, the thrust of appellant's argument is that the establishment of an implied warranty of habitability is the setting of social policy, which is a function of the legislature. Specifically, appellant maintains that, because the legislature has acted in the field via the Rent Withholding Act, Act of January 24, 1966, P.L. 1534, *as amended*, 35 P.S. § 1700–1 (1977), the courts are prohibited from further development of common law solutions to landlord-tenant/habitability problems. We cannot accept this position.

The Rent Withholding Act (hereinafter the Act) provides: "Notwithstanding any other provision of law, or of any agreement, whether oral or in writing, whenever the Department of Licenses and Inspections of any city of·the first class, or the Department of Public Safety of any city of the second class, second class A, or third class as the case may be, or any Public Health Department of any such city, or of the county in which such city is located, certifies a dwelling as unfit for human habitation, the duty of any tenant of such dwelling to pay, and the right of the landlord to collect rent shall be suspended without affecting any other terms or conditions of the landlord-tenant relationship, until the dwelling is certified as fit for human habitation or until the tenancy is terminated for any reason other than nonpayment of rent. During any period when the duty to pay rent is suspended, and the tenant continues to occupy the dwelling, the rent withheld shall be deposited by the tenant in an escrow account in a bank or trust company approved by the city or county as the case may be and shall be paid to the landlord when the dwelling is certified as fit for human habitation at any time within six months from the date on which the

dwelling was certified as unfit for human habitation. If, at the end of six months after the certification of a dwelling as unfit for human habitation, such dwelling has not been certified as fit for human habitation, any moneys deposited in escrow on account of continued occupancy shall be payable to the depositor, except that any funds deposited in escrow may be used, for the purpose of making such dwelling fit for human habitation and for the payment of utility services for which the landlord is obligated but which he refuses or is unable to pay. No tenant shall be evicted for any reason whatsoever while rent is deposited in escrow."

Initially we note the Act is applicable only to cities of the first three classes and so is, by its terms, not applicable to the case at bar. Nevertheless, we must consider appellant's contention that, by acting *at all*, the legislature has precluded the judiciary from common law development in the landlord-tenant/habitability area.

The Act does not purport to be the exclusive tenant remedy for unsavory housing, nor does it attempt to replace or alter certain limited and already existing tenant remedies such as constructive eviction. *Kelly v. Miller,* 249 Pa. 314, 94 A. 1055 (1915). The Act's silence as to constructive eviction could not be construed, without more, as a legislative abolition of that doctrine. Neither can mere enactment of the Rent Withholding Act signal a legislative intent to remove from the courts the authority to fashion new remedies where appropriate in the landlord–tenant field.

*Caveat emptor* was a creature of the common law. *Elderkin v. Gastner, supra,* 447 Pa. at 123, 288 A.2d at 774. Courts have a duty "to reappraise old doctrines in the light of the facts and values of contemporary life—particularly old common law doctrines which the courts themselves have created and developed." *Javins v. First National Realty Corp., supra* 138 U.S.App.D.C. at 372, 373, 428 F.2d, 1074 at 1074, quoted in *Albert M. Greenfield & Co., Inc. v. Kolea, supra* at 357, 380 A.2d at 760. And when a rule has been

duly tested by experience and found inconsistent with the sense of justice or the social welfare there should be little hesitation in "frank avowal and full abandonment." Cardozo, *The Nature of the Judicial Process*, 150–51 (1921), cited in *Griffith v. United Airlines, Inc.*, 416 Pa. 1, 23, 203 A.2d 796, 806 (1964). We have followed these principles recently in several decisions which are clearly founded on a realization of, and adaption of the law to correspond to, changing social policy. *Ayala v. Philadelphia Board of Education*, 453 Pa. 584, 305 A.2d 877 (1973) (governmental immunity abolished) and *Flagiello v. Pennsylvania Hospital*, 417 Pa. 486, 208 A.2d 193 (1965) (immunity for charitable institutions abolished).

In reappraising antiquated laws, it is entirely proper to seek guidance from policies underlying related legislation.

"[c]ourts, in assessing the continued vitality of precedents, rules and doctrines of the past, may give weight to the policies reflected in more recent, widespread legislation, though the statutes do not apply—treating the total body of the statutory law in the manner endorsed long ago by Mr. Justice Stone 'as both a declaration and a source of law, and as premise for legal reasoning' (*The Common Law in the United States*, 50 Harv.L.Rev. 4, 13 [1976])."
Introduction to Restatement (Second) of Property, Landlord and Tenant.

The purpose of the Act is to restore substandard housing to a reasonable level of habitability as swiftly as possible and to deter landlords from allowing their property to deteriorate into a condition unfit for habitation. *Newland v. Newland*, 26 Pa.Cmwlth. 519, 364 A.2d 988 (1976) and *Palmer v. Allegheny County Health Department*, 21 Pa.Cmwlth. 246, 345 A.2d 317 (1975). The adoption of the implied warranty of habitability is consistent with this policy.

Appellate courts of other jurisdictions have considered and rejected the argument that a state's rent withholding act or other statutory remedies precluded judicial adoption of the implied warranty of habitability. In *Boston Housing Au-*

*thority v. Hemingway,* 363 Mass. 184, 293 N.E.2d 831 (1973), the Massachusetts Supreme Court reviewed the overwhelming support from other jurisdictions which have judicially sanctioned the implied warranty and stated "All of these decisions are predicated on the implied assumption that remedial legislation designed to promote safe and sanitary housing does not preclude the courts from fashioning new common law rights and remedies to facilitate the policy of safe and sanitary housing embodied in the withholding statutes." *Id.* at 293 N.E.2d 841. That court further reasoned that failure to adopt the warranty of habitability would render that state's statutory law and common law conceptually and functionally inconsistent. *See also, Green v. Superior Court,* 10 Cal.3d 616, 111 Cal.Rptr. 704, 517 P.2d 1168 (1974) (state statute authorizing tenants to repair defective conditions and deduct expenses from rent held not exclusive remedy and not preclusive of judicial adoption of common law implied warranty of habitability) and *Jack Springs, Inc. v. Little,* 50 Ill.2d 351, 280 N.E.2d 208 (1972) (rent withholding statute not exclusive remedy and not preclusive of judicial adoption of common law implied warranty of habitability); *cf. Blackwell v. Del Bosco,* Colo., 558 P.2d 563 (1976) (lone appellate decision deferring adoption of implied warranty of habitability to legislature, although not predicated on existing statutory tenant rights and remedies). We conclude, therefore, that the Rent Withholding Act is not the exclusive tenant remedy for a landlord's failure to maintain the leased premises in a habitable state nor does it preclude judicial development of common law landlord and tenant obligations, rights and remedies. To the contrary, the Act supports the adoption of the implied warranty of habitability.

III. BREACH OF THE IMPLIED WARRANTY OF HABITABILITY

Appellant also asserts that the Superior Court erred by failing to establish definite standards by which habitability can be measured and breach of the warranty ascertained. We disagree—the parameters of the warranty were adequately defined by the Superior Court.

██ "The implied warranty is designed to insure that a landlord will provide facilities and services vital to the life, health, and safety of the tenant and to the use of the premises for residential purposes. *King v. Moorehead,* at 495 S.W.2d 75." *Pugh v. Holmes,* 253 Pa.Super. 87, 384 A.2d at 1240. This warranty is applicable both at the beginning of the lease and throughout its duration. *Id.* citing *Old Town Development Co. v. Langford,* 349 N.E.2d 744, 764 (Ind.App.1976) and *Mease v. Fox,* 200 N.W.2d 791, 796 (Iowa 1972).

██ In order to constitute a breach of the warranty the defect must be of a nature and kind which will prevent the use of the dwelling for its intended purpose to provide premises fit for habitation by its dwellers. At a minimum, this means the premises must be safe and sanitary—of course, there is no obligation on the part of the landlord to supply a perfect or aesthetically pleasing dwelling. *Pugh v. Holmes,* 253 Pa.Super. 87, 384 A.2d at 1240. "Materiality of the breach is a question of fact to be decided by the trier of fact on a case-by-case basis." *Id.* Several factors (not exclusive) are listed by the Superior Court as considerations in determining materiality, including the existence of housing code violations and the nature, seriousness and duration of the defect. *Id.*

We believe these standards fully capable of guiding the fact finder in his determination of materiality of the breach. Further, these standards are flexible enough to allow the gradual development of the habitability doctrine in the best common law tradition. This finds support in *Elderkin v. Gaster, supra,* wherein we declined to establish rigid standards for determining habitability and its breach in the builder/vendor—vendee context and, instead, defined habitability in terms of "contemporary community standards" and breach of the warranty as whether the defect prevented the use of the dwelling for the purposes intended—habitation. 447 Pa. at 128, 288 A.2d at 777. In that case, we held that lack of a potable water supply to the home prevented its use as habitation and, accordingly, found the implied warranty of habitability to have been breached.

■ Additionally, we agree with the Superior Court that, to assert a breach of the implied warranty of habitability, a tenant must prove he or she gave notice to the landlord of the defect or condition, that he (the landlord) had a reasonable opportunity to make the necessary repairs, and that he failed to do so. 253 Pa. Super. 88, 384 A.2d at 1241.

■ Appellant would require that a determination of breach of the implied warranty be dependent upon proof of violations of the local housing codes. We decline to accept this argument as it would unnecessarily restrict the determination of breach. The Supreme Court of Massachusetts was asked to define their implied warranty of habitability by reference to a housing code of statewide applicability, but declined to do so. In *Boston Housing Authority v. Hemingway*, 293 N.E.2d 831 (Mass.1973) that court stated:

"The State Sanitary Code minimum standards of fitness for human habitation and any relevant local health regulations provide the trial court with the threshold requirements that all housing must meet. Proof of any violation of these regulations would usually constitute compelling evidence that the apartment was not in habitable condition, regardless of whether the evidence was sufficient proof of a constructive eviction under our old case law. However, the protection afforded by the implied warranty or [sic] habitability does not necessarily coincide with the Code's requirements. There may be instances where conditions not covered by the Code regulations render the apartment uninhabitable. Although we have eliminated the defense of constructive eviction in favor of a warranty of habitability defense, a fact situation, which would have demonstrated a constructive eviction, would now be sufficient proof of a material breach of the warranty of habitability, regardless of whether a sanitary code violation existed or not. 293 N.E.2d at 844, n.16."

Other courts have likewise concluded that the existence of housing code violations is only one of several evidentiary considerations that enter into the materiality of the breach issue. E. g., *Foisy v. Wyman,* 83 Wash.2d 22, 515 P.2d 160

(1973); *King v. Moorehead,* 495 S.W.2d 65 (Mo.App.1973); *Mease v. Fox,* 200 N.W.2d 791 (Iowa 1972). This reasoning is even more persuasive in Pennsylvania where there is no statewide housing code and where many municipalities have not promulgated local housing regulations.[3]

In this case, appellee alleged ten specific defective conditions including a leaky roof, lack of hot water, leaking toilet and pipes, cockroach infestation and hazardous floors and steps. If proven on remand, these conditions would substantially prevent the use of the premises as a habitable dwelling place and could justify a finding by the trier of fact that a breach of the implied warranty of habitability had occurred.

## IV. REMEDIES FOR BREACH OF IMPLIED WARRANTY OF HABITABILITY

As the adoption today of the implied warranty of habitability creates new legal rights and obligations, it is essential for this Court to outline and clarify some of the available remedies and the manner in which these remedies are to be implemented. The tenant may vacate the premises where the landlord materially breaches the implied warranty of habitability—we have held analogously where the landlord materially breaches express covenants to repair or to maintain the leasehold in a habitable state. *See McDanel v. Mack Realty Co., supra,* 315 Pa. at 174, 172 A. 97. Surrender of possession by the tenant would terminate his obligation to pay rent under the lease. *Lemle v. Breeden,* 51 Haw. 426, 462 P.2d 470 (1969) Murray, *On Contracts—A Revision of Grismore on Contracts,* § 183, Mutual Performances in Leases—The Implied Warranty of Habitability (1974) (hereinafter *Murray*).

3. Brief for Appellant at 31 notes that many small boroughs and townships have not adopted such regulations. And, according to Brief for Amicus Curiae, Central Pennsylvania Legal Services, p. 15, only six of seventy-two municipalities in York County, eleven of the fifty-nine municipalities in Lancaster County, and twelve out of seventy-five in Berks County have housing codes. In Perry County there are no municipalities with housing codes.

Where the tenant remains in possession, and the landlord sues for possession for unpaid rent, the implied warranty of habitability may be asserted as a defense. Virtually all courts addressing the issue of breach of this warranty as a defense concur with this view. *See e. g.,* cases cited by the Superior Court at 384 A.2d 1240 and *Rome v. Walker,* 38 Mich.App. 458, 196 N.W.2d 850 (1972); *Fritz v. Warthen,* 298 Minn. 54, 213 N.W.2d 339 (1973); *see* Restatement (Second) of Property, Landlord and Tenant, § 11.1 (Rent Abatement). If the landlord totally breached the implied warranty of habitability, the tenant's obligation to pay rent would be abated in full—the action for possession would fail because there would be no unpaid rent. *Pugh v. Holmes, supra,* 384 A.2d at 1241, *citing Javins v. First National Realty Corp., supra,* 138 U.S.App.D.C. at 380–81, 428 F.2d 1082–83. If the landlord had not breached the warranty at all, no part of the tenant's obligation to pay rent would be abated and the landlord would be entitled to a judgment for possession and for unpaid rent. *Id.* If there had been a partial breach of the warranty, the obligation to pay rent would be abated in part only. In such case, a judgment for possession must be denied if the tenant agrees to pay that portion of the rent not abated; if the tenant refuses to pay the partial rent due, a judgment granting possession would be ordered. *Id.*

Appellant urges that the failure of the Superior Court to require a method of escrowing unpaid rent monies is "the most glaring defect" in the Superior Court's decision below. This Court is in favor of an escrow procedure, but is not inclined to make such procedure mandatory. Rather, the decision whether a tenant should deposit all or some of the unpaid rents into escrow should lie in the sound discretion of the trial judge or magistrate. The tenant may retain his rent, subject to the court's discretionary power to order him, following a hearing on the petition of the landlord or tenant, to deposit all or some of the rent with the court or a receiver appointed by the court. This is the approach taken by a majority of the courts which permit the tenant to

withhold rent pending the outcome of litigation in which the defense of the implied warranty of habitability is asserted. Restatement (Second) of Property, Landlord and Tenant § 11.3, Reporter's note 2 (1970) *citing, e. g., Javins v. First National Realty Corp., supra* and *Hinson v. Delis,* 26 Cal. App.3d 62, 102 Cal.Rptr. 661 (1972). Factors to be considered include the seriousness and duration of the alleged defects, and the likelihood that the tenant will be able to successfully demonstrate the breach of warranty. *Id.*

Also at issue in this case is the availability of the "repair and deduct" remedy. Appellee, after allegedly giving notice to the landlord and a reasonable opportunity to repair, repaired a broken door lock and deducted $6.00 from her rent for the month of May, 1975. We have held that, where a landlord fails to perform a lease covenant, the tenant may perform it at his own expense (if reasonable) and deduct the cost of his performance from the amount of rent due and payable. *McDanel v. Mack Realty Co., supra,* 315 Pa. at 177, 172 A. 97 (landlord failed to perform covenant to supply heat—tenant could have provided heat and deducted reasonable costs from rent). Similarly, the repair and deduct remedy is appropriate for breaches of the implied warranty of habitability. This remedy has been approved in other jurisdictions, *Marini v. Ireland,* 56 N.J. 130, 265 A.2d 526 (1970); *Garcia v. Freeland Realty Co.,* 63 Misc.2d 937, 314 N.Y.S.2d 215 (1970) and by the Restatement (Second) of Property, Landlord and Tenant § 11.2. Section 11.2 provides "[i]f a tenant is entitled to apply his rent to eliminate the landlord's default, the tenant, after proper notice to the landlord, may deduct from his rent reasonable costs incurred in eliminating the default." "Proper notice" in this instance is one that describes the default and specifies what steps will be taken by the tenant to correct it if the landlord has not eliminated the defective condition within a reasonable time. *See* comment a. to § 11.2. The use of the repair and deduct remedy is not, of course, unlimited. Repairs must be reasonably priced and cannot exceed the amount of the rent available to apply against the cost, i. e. the amount of rent

owed for the term of the lease. *Merilh v. Pan American Films,* 200 So.2d 398 (La.App.1967). *See* comment c. to § 11.2. . Further the tenant runs the risk of an adverse court finding on the necessity of the repairs—if the court finds that the repairs were not needed to render the premises habitable, the court must find the rent deduction unreasonable. In such event, the landlord could obtain a judgment for the amount of rent deducted. Or if the repairs were needed but the cost was excessive, the landlord could recover the difference between the actual cost and what would have been the reasonable cost of repairs.

 Appellant also asserted a counterclaim for $25.00 for repairs allegedly made at various times to the heating system, the bathroom floor and to replace a broken window pane. In principle, we see little difference between the counterclaim for repairs and the "repair and deduct" remedy. The counterclaim can be utilized to recover damages from already paid rents based upon expenses incurred in making repairs of defective conditions after failure of the landlord to repair within a reasonable time following proper notice. *See Marini v. Ireland, supra* and *Garcia v. Freeland Realty Co., supra, Pines v. Perssion,* 14 Wis.2d 590, 111 N.W.2d 409 (1961). The limitations applicable to the repair and deduct remedy are applicable here as well—the cost of the repairs must be reasonable and the maximum amount which the tenant may expend is the amount of rent owed for the term of the lease. However the counterclaim is not available where the tenant has not paid his rent for the period in which the repairs are made and the cost of the repairs do not exceed the rent owed for that period. In that case, there are no damages as the tenant has already been compensated for the cost of repairs by not paying rent.[4]

4. From the pleadings, it appears that some of appellee's counterclaims were for recovery of the cost of repairs from *already* paid rents while some of the counterclaims were for repairs made during periods in which no rent was paid. If such is the case, the latter claims would fail as the appellee would have suffered no damages.

 Finally, since the lease is a contract, other traditional contract remedies such as specific performance are available to enforce the implied warranty of habitability. *Javins, supra* 138 U.S.App.D.C. at 380, at 428 F.2d 1082, n. 61; *see* Uniform Residential Landlord and Tenant Act § 4.101(b) (1972) *and* Blumberg and Robbins, *Beyond URL-TA: A Program for Achieving Real Tenant Goals,* 11 Harv. Civ.Rts.—Civ.Lib.L.Rev. 1 (1976). As with other contracts, however, specific performance is an equitable remedy not available as a matter of course but only in unique situations. 11 S. Williston, *Contracts* § 1418A (3d ed. 1968); *Murray, supra* at § 220.

## V. MEASURE OF RENT ABATED

 The Superior Court held, where the tenant claims the breach of warranty of habitability as a defense or counterclaim "the monthly rent past and future (until the dwelling is returned to a habitable state) may be reduced by the difference between the agreed upon rent and the fair rental value of the apartment in its present condition." It is urged that this Court adopt the "percentage reduction of use" method of calculating damages for breach of the implied warranty (This method would reduce the amount of rent owed by a percentage equal to the percentage by which the use of the premises has been decreased by the breach of warranty.) rather than the "fair rental value" approach suggested by the Superior Court. We hold that the "percentage reduction in use" method is the correct manner of determining the amount by which the obligation to pay rent is abated.

The "fair market value" approach suffers from two drawbacks. The first is that it assumes there is a *fair* market for the defective premises. This assumption is questionable given the housing crises which exists today. *Reitmeyer v. Sprecher, supra* 431 Pa. at 289–90, 243 A.2d at 398 (1968). Because of the housing shortage, "Premises which, under normal circumstances, would be completely unattractive for rental are now, by necessity, at a premium." *Id.,* 431 Pa. at

290, 243 A.2d at 398. As one author phrased it "it seems questionable whether in asserting damages in this situation cognizance should be taken of a 'fair' market value of noncomplying housing—such a market could be regarded as an illegal 'black market' existing only by violation of law." Note, 84 Harv.L.Rev. 729, 737 (1971).

The second flaw is a practical one. The determination of the fair market value of the defective dwelling would in all probability require some type of market survey, statistical evidence, or expert testimony from realtors or appraisers familiar with the local rental market. *See*, Moskovitz, *"The Implied Warranty of Habitability: A New Doctrine Raising New Issues*: 62 Calif.L.Rev. 1444, 1467–68 (1974). "The cost of obtaining such evidence or testimony would simply be prohibitive to many litigants, especially low-income tenants." *Id.*

One court which initially adopted a "fair market value" approach in computing the amount of rent to be abated, *McKenna v. Begin*, 3 Mass.App. 168, 325 N.E.2d 587 (1975) (*McKenna* I), rejected that approach following appeal from the trial court on remand, and opted for the "percentage reduction in use" formula, *McKenna v. Begin*, 362 N.E.2d 548 (Mass.App.1977) (*McKenna* II), in order to fashion a measure of damages "which more closely reflects the actual injury suffered by [the tenant]." 362 N.E.2d 552. Under this approach, the rent is to be abated "by a percentage reflecting the diminution the value of the use and enjoyment of leased premises by reason of the existence of defects which gave rise to the breach of habitability." *Id.* citing *Green v. Superior Court, supra, Academy Spires, Inc. v. Brown*, 111 N.J.Super. 477, 268 A.2d 556 (1970) and *Morbeth Realty Corp. v. Rosenshine*, 67 Misc.2d 325, 323 N.Y.S.2d 363 (N.Y.Cir.Ct.1971).

This method of evaluation better achieves the goal of returning the injured party (the tenant) to the position he would have been in if performance had been rendered as warranted. Corbin, *Contracts* § 992 (1964); *Murray, supra* at § 220. The tenant bargains for habitable premises and

the rental price reflects the value placed on those premises by the parties. Therefore, where the premises are rendered uninhabitable, in whole or in part, the contract price (fixed by the lease) is to be reduced by the percentage which reflects the diminution in use for the intended purpose. Another advantage of the percentage reduction method is that the need for expert testimony is greatly reduced as the determination in "percentage of reduction in use" of a residential dwelling is a matter within the capabilities of the layman.

■ Finally, there should be no doubt that recovery will not be precluded simply because there is some uncertainty as to the precise amount of damages incurred. It is well established that mere uncertainty as to the amount of damages will not bar recovery where it is clear that damages were the certain result of the defendant's conduct. *Academy Spires, Inc., supra,* 111 N.J.Super. at 486, 268 A.2d 556. McCormick, *Damages* § 27, p. 101 (1935). The basis for this rule is that the breaching party should not be allowed to shift the loss to the injured party when damages, even if uncertain in amount, were certainly the responsibility of the party in breach. *Story Parchment Company v. Paterson Paper Company,* 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931). As noted by the Supreme Court of California, damages in this case "do not differ significantly from a host of analogous situations, in both contract and tort law, in which damages cannot be computed with complete certainty." *Green v. Superior Court, supra,* 10 Cal.3d at 638, 111 Cal. Rptr. at 719, 517 P.2d at 1183.

Accordingly, on remand, if breach of the implied warranty of habitability is proven, the trial court is to apply the "percentage reduction in use" formula to determine the percentage by which the use and enjoyment of the premises had been diminished.

For the foregoing reasons, we overrule all cases inconsistent with this opinion, affirm the order of the Superior Court

with the aforementioned modifications, and remand to the Court of Common Pleas of Franklin County for proceedings consonant with this opinion.

ROBERTS, J., filed a concurring opinion in which NIX and MANDERINO, JJ., join.

OPINION CONCURRING IN PARTS I, II & III

ROBERTS, Justice.

I join in Parts I, II & III of the Opinion of the Court which adopt the position of the Restatement (Second) of Property, Landlord and Tenant §§ 5.5(1) & (3) and Comment f (1977). As the Reporter's Note to Section 5.5 points out,

"to impose the burden on the landlord fulfills the expectations of the parties that the tenant seeks property suitable for a dwelling and the landlord provides property fit for that purpose:

The very object of the letting was to furnish the defendant [the tenant] with quarters suitable for living purposes. This is what the landlord at least impliedly (if not expressly) represented he had available and what the tenant was seeking. *Marini v. Ireland*, 56 N.J. 130, 144, 265 A.2d 526, 533–534 (1970).

Thus, in leases of residential property the conclusion is justified that the landlord impliedly promised to make repairs. A number of courts have adopted the position of this section that the landlord's implied promise of habitability and the tenant's obligation to pay rent are mutually dependent. *Green v. Superior Court*, 10 Cal.3d 616, 111 Cal.Rptr. 704, 517 P.2d 1168 (1974); *Rome v. Walker*, 38 Mich.App. 458, 196 N.W.2d 850 (1972); *Fritz v. Warthen*, 298 Minn. 54, 213 N.W.2d 339 (1973); *Berzito v. Gambino*, 63 N.J. 460, 308 A.2d 17 (1973)."

Because, however, this case is before this Court on a demurrer, I believe any discussion of remedies and damages pre-

mature. I would remand for proceedings consistent with Parts I, II, and III of the Opinion of the Court.

NIX and MANDERINO, JJ., join in this opinion.