(No. 60154.—

MERWIN M. GLASOE, Ex'r, Appellee, v. JERRY
TRINKLE *et al.*, Appellants.

*Opinion filed June 5, 1985.*

Donald J. Hanrahan and George J. Bell, of Champaign, for appellants.

No appearance for appellee.

Kathleen C. Yannias, of Chicago, for *amicus curiae* Chicago Lawyers' Committee for Civil Rights Under Law, Inc.

Richard E. Blumberg, of Berkeley, California (Michael A. O'Connor, of Chicago, of counsel), for *amicus curiae* National Housing Law Project.

JUSTICE RYAN delivered the opinion of the court:

This cause involves a suit by Merwin O. Glasoe, a landlord, against Jerry and Diane Trinkle, his former tenants, to recover $960 in rent. The Trinkles filed an answer denying that rent was due and owing and also raised several affirmative defenses and counterclaims. Following a bench trial in the circuit court of Champaign County, the trial court entered judgment for Glasoe in the amount of $152.69. The Trinkles appealed from that portion of the judgment which dismissed their second affirmative defense and second counterclaim for failure to state a cause of action. The Trinkles had alleged in those counts that an implied warranty of habitability was a part of their lease and that they were entitled to recover damages resulting from the breach of that warranty. The appellate court affirmed (123 Ill. App. 3d 132), and we allowed the Trinkles' petition for leave to appeal under Rule 315 (87 Ill. 2d R. 315). Subsequently, due to the death of Merwin O. Glasoe, we allowed the Trinkles' motion to substitute Merwin M. Glasoe, the personal repre-

sentative of the estate of Merwin O. Glasoe, as appellee. No brief for the appellee has been filed in this court.

The principal issue on appeal is whether the implied warranty of habitability applies to leases of residential real estate located in areas which have not enacted housing or building codes.

The following facts are pertinent to this appeal. On August 18, 1978, the Trinkles entered into an oral agreement to rent, on a monthly basis, one of three units in a triplex owned by Glasoe in St. Joseph. The Trinkles tendered a security deposit and rent and resided in the unit until October 17, 1981, when they vacated the premises. In February 1982, Glasoe sued the Trinkles alleging that they owed him rent for the months of July, August, September, and October of 1981. The Trinkles filed an answer denying that they owed rent and also raised several affirmative defenses and counterclaims.

The Trinkles' first affirmative defense was that they had been constructively evicted. Jerry Trinkle testified that when he went to light the furnace on October 15, 1981, he discovered a hole in the heating chamber and determined that it was not safe to light the furnace. He also testified that he knew Glasoe was unable to repair the furnace himself because he was in jail at the time and that Glasoe was unable to pay someone else to repair or replace it. In light of the above facts and the fact that they needed heat because one of their children was returning from the hospital, the Trinkles decided to seek another place to live. They vacated the premises on October 17, 1981, and moved to the nearby community of Fithian. The Trinkles counterclaimed for the difference between the rent at the old premises in St. Joseph and the rent they paid at the new premises in Fithian for the period of October 17, 1981, to November 30, 1981. They requested that a judgment be entered in that amount or that they be granted a setoff against the rent claimed by

Glasoe.

The Trinkles' second affirmative defense was that an implied warranty of habitability applied to the premises and that Glasoe breached that warranty. They alleged that at the time Glasoe rented the unit to them and during their occupancy numerous defects and substandard conditions rendered the premises unsafe, unhealthful, and unfit for occupancy. The Trinkles presented testimony showing that: (1) the only source of heat for the living room was a space heater and that the blower on the heater stopped working during the winter of 1978; (2) the blower in the main furnace did not operate for two weeks in the winter of 1980; (3) Glasoe installed an incorrect replacement motor for the blower which caused the blower to run continuously; (4) sewage leaked through the ceiling into their bedroom and their children's bedroom on two occasions; (5) problems with the plumbing caused their toilet to overflow at various times; (6) the bathroom ceiling collapsed in 1979 and was not replaced; (7) water leaked through the ceiling into the kitchen; (8) sewage collected in an open ditch which had been dug by Glasoe; (9) sewage leaked from sewer lines in the basement into a sump pump and was then pumped into the yard; (10) the unit was infested with cockroaches and rodents; (11) the front door was difficult to open and close because it was swollen from the weather; (12) there was a large hole in the decaying floor of the back porch; and (13) the windows and doors were not properly sealed.

The Trinkles claimed that if the unit had been in a habitable condition, the fair rental value of the unit would have been equal to the rent they agreed to pay Glasoe. They alleged that the proper rental value of the unit in its actual condition throughout the tenancy had been an average of 60% of the agreed rental. The Trinkles therefore counterclaimed for the difference between

the aggregate rent they actually paid Glasoe and the aggregate proper rental value. In addition, they counterclaimed for the costs of replacing the beds and bedding damaged by the leaks and the increased utility bills incurred as a result of the problems with the space heater and furnace.

The Trinkles' third affirmative defense was that Glasoe had promised as part of the lease agreement to lower the living room ceiling and to replace the front door. They alleged in their counterclaim that they were damaged by Glasoe's failure to make those repairs because the living room was less energy efficient and because their ability to enter and exit the unit was hindered. They requested a judgment in the amount of those damages or a setoff in the same amount against the rent claimed by Glasoe.

The Trinkles' fourth affirmative defense was that they had tendered a security deposit to Glasoe and that he had failed to return it to them although they had left the premises in a clean and undamaged condition. They counterclaimed for a judgment in the amount of the security deposit or for a setoff in the same amount against the rent claimed by Glasoe.

The Trinkles' last counterclaim sought indemnification for collect telephone calls made by Glasoe to the Trinkles' telephone. They requested a judgment in the amount of those calls or a setoff in the same amount against the rent claim by Glasoe.

The trial court rendered its judgment on April 13, 1983. It first addressed Glasoe's claim that $960 in rent was due and owing for the months of July through October of 1981. After deducting certain credits due the Trinkles, the court determined that they owed Glasoe $458.44 for unpaid rent. The credits represented a newspaper bill the Trinkles had paid for Glasoe and bond they had posted for him on two occasions. As to the Trinkles'

first affirmative defense and counterclaim, the court held that since a major component of the rental unit (the furnace) was not available to the Trinkles, they were constructively evicted by Glasoe. The court awarded the Trinkles damages in the amount of $157.01. This amount represented the difference between the rent the Trinkles had paid Glasoe for the old premises in St. Joseph and the rent they paid at the new premises in Fithian for the period of October 17, 1981, to November 30, 1981. With regard to the Trinkles' second affirmative defense and counterclaim, the trial court held that since St. Joseph did not have a building code that applied to rental housing, the implied warranty habitability could not be raised.

The trial court did not consider the Trinkles' third affirmative defense and counterclaim because the Trinkles had withdrawn them during trial. As to the Trinkles' fourth affirmative defense and counterclaim, Glasoe stipulated that the Trinkles were entitled to a full refund of their security deposit in the amount of $110. With regard to the Trinkles' last counterclaim, Glasoe also stipulated that he owed them $38.74 for collect telephone calls. The trial court deducted the above setoffs from the rent due Glasoe and entered judgment for him in the amount of $152.69, plus court costs.

This court has recognized the implied warranty of habitability in a variety of situations. In the landlord-tenant context, it was held in *Jack Spring, Inc. v. Little* (1972), 50 Ill. 2d 351, that the implied warranty of habitability applied to leases, both oral and written, of multiple-unit dwellings. In *Pole Realty Co. v. Sorrells* (1981), 84 Ill. 2d 178, this court extended the warranty to leases of single-family dwellings. Outside the landlord-tenant context, this court held in *Petersen v. Hubschman Construction Co.* (1979), 76 Ill. 2d 31, that the implied warranty of habitability applied to contracts for the sale of

new homes by builder-vendors. In *Park v. Sohn* (1982), 89 Ill. 2d 453, it was held that the warranty applied to the sale of a house by a builder-vendor even though he had lived in the house for approximately two years before the sale and he had previously built only one house. In *Redarowicz v. Ohlendorf* (1982), 92 Ill. 2d 171, this court extended the implied warranty of habitability from builder-vendors of new homes to subsequent purchasers.

In the case at bar, it is undisputed that the town of St. Joseph had not enacted a housing or building code. It was for that reason the courts below held that the Trinkles' second affirmative defense and second counterclaim, which were based on the implied warranty of habitability, failed to state a cause of action. The appellate court concluded that *"Jack Spring* and *Pole Realty* do not require the extension of an implied warranty of habitability to leased residential real estate in the absence of a building code, unless and until further extension is required by the supreme court." (123 Ill. App. 3d 132, 136.) We now hold that the implied warranty of habitability applies to all leases of residential real estate regardless of the existence of housing or building codes.

The above holding is not inconsistent with the decision in *Jack Spring, Inc. v. Little* (1972), 50 Ill. 2d 351. In *Jack Spring* it was held that an implied warranty of habitability applied to the leases at issue and that the warranty was "fulfilled by substantial compliance with the pertinent provisions of the Chicago building code." (50 Ill. 2d 351, 366.) This statement has been interpreted by some divisions of our appellate court to mean that the implied warranty of habitability is only fulfilled by substantial compliance with a building code. (See *Auburn v. Amoco Oil Co.* (1982), 106 Ill. App. 3d 60; *Beese v. National Bank* (1980), 82 Ill. App. 3d 932; *Dapkunas v. Cagle* (1976), 42 Ill. App. 3d 644.) However, this court never stated in *Jack Spring* or in subsequent decisions

that a housing or building code was a prerequisite for application of the warranty. In *Jack Spring* the court referred to a building code because the case happened to involve leases of property located in the city of Chicago which had an applicable building code. Yet, in *Petersen, Park,* and *Redarowicz* the court extended the implied warranty of habitability to the sale of new homes without requiring the existence of housing or building codes.

It would be illogical and inconsistent to require the existence of a housing or building code in cases involving leases of residential property but not in cases involving the sale of new homes by builder-vendors. Both renters and purchasers of new homes have a right to expect that their respective rental unit or home will be reasonably suited for its intended use, that is, habitation. Just as tenants in single-family dwellings have the same legitimate expectations as those in multiple-unit dwellings (*Pole Realty Co. v. Sorrells* (1981), 84 Ill. 2d 178, 182), so tenants in areas without building codes have the same legitimate expectations as those in areas with building codes. All tenants of residential property enter into leases with the legitimate expectation that the dwelling will be fit for habitation for the entire period of the tenancy.

In *Pugh v. Holmes* (1979), 486 Pa. 272, 290-91, 405 A.2d 897, 906, the Supreme Court of Pennsylvania noted that there was no statewide housing code in that State and that many municipalities had not enacted local housing regulations. The court refused to hold that a breach of the implied warranty is dependent upon the proof of violations of housing codes. The court pointed out that the existence of housing code violations is only one of several evidentiary considerations that entered into the materiality of the breach, citing *Boston Housing Authority v. Hemmingway* (1973), 363 Mass. 184, 293 N.E.2d 831, *Foisy v. Wyman* (1973), 83 Wash. 2d 22, 515 P.2d

160, *King v. Moorehead* (Mo. App. 1973), 495 S.W.2d 65, and *Mease v. Fox* (Iowa 1972), 200 N.W.2d 791. Thus, we hold, as the Pennsylvania court held, that the absence of a statewide housing or building code in Illinois and the absence of such a code in St. Joseph does not preclude the application of the implied warranty of habitability to the property in question.

It is not our purpose to write a housing code for this State or for the city of St. Joseph. Whether or not there are certain minimum standards for housing with which residential property must comply before it can be rented is a matter of policy to be determined by the appropriate legislative body. Therefore, habitability standards may vary, being measured by community standards as stated in *Detling v. Edelbrock* (Mo. 1984), 671 S.W.2d 265, 270. Also, as stated in *Marini v. Ireland* (1970), 56 N.J. 130, 144-45, 265 A.2d 526, 534, the legitimate expectation of the tenant as to the nature of the vital facilities and the extent and types of maintenance and repair are limited by the type of property and the amount of rent paid. In Illinois, as in Pennsylvania, in areas where no municipal housing code is in force there is no statewide law that specifies minimum standards for residential housing. (See *Pugh v. Holmes* (1979), 486 Pa. 272, 290-91, 405 A.2d 897, 906.) We note that House Bill 0695, of the 84th General Assembly, 1985-86, was introduced in the House of Representatives on March 13, 1985. That bill provided certain minimum standards for residential housing units and placed the responsibility on the owner to maintain the dwelling unit in conformance with those standards. However, that bill was assigned to the Judiciary I Committee of the House of Representatives and has been tabled. House Bill 0695 is patterned after the Uniform Residential Landlord and Tenant Act, 1972 Act. (7A Unif. Laws Ann. 499 *et seq.* (1978).) House Bill 0329 and House Bill 2227 were also introduced in the House

of Representatives during the current term. Both bills were assigned to the Judiciary I Committee of the House of Representatives, and no further action has been taken on those bills.

The scope of the implied warranty of habitability has been addressed by courts of other jurisdictions in the cases discussed below. Clearly, the warranty requires that a dwelling be fit for its intended use; that is, it should be habitable and fit for living. (See *Petersen v. Hubschman Construction Co.* (1979), 76 Ill. 2d 31.) The warranty also requires that at the inception of the lease there be no latent defects in those facilities vital to the use of the dwelling for residential purposes and vital to the life, health, and safety of the tenant and that the premises will remain habitable throughout the term of the lease. *Detling v. Edelbrock* (Mo. 1984), 671 S.W.2d 265, 270; *Marini v. Ireland* (1970), 56 N.J. 130, 144, 264 A.2d 526, 534.

In order to constitute a breach of the implied warranty of habitability, the defect must be of such a substantial nature as to render the premises unsafe or unsanitary, and thus unfit for occupancy. (*Kline v. Burns* (1971), 111 N.H. 87, 93, 276 A.2d 248, 252; *Mease v. Fox* (Iowa 1972), 200 N.W.2d 791, 796.) A landlord is not required to insure that the dwelling is in a perfect or aesthetically pleasing condition. (*Green v. Superior Court* (1974), 10 Cal. 3d 616, 637, 517 P.2d 1168, 1182, 111 Cal. Rptr. 704, 718.) In *Green* the California court stated that minor housing code violations alone which do not affect habitability will not entitle a tenant to relief. Thus, "[n]ot every defect or inconvenience will be deemed to constitute a breach of the covenant of habitability." (*Berzito v. Gambino* (1973), 63 N.J. 460, 469, 308 A.2d 17, 22.) Whether there has been a breach of the warranty is a question of fact to be determined on a case-by-case basis. *Kline v. Burns* (1971), 111 N.H. 87, 93, 276 A.2d

248, 252; *Mease v. Fox* (Iowa 1972), 200 N.W.2d 791, 796.

In determining whether there has been breach of the implied warranty, the courts have considered various factors, including the nature of the deficiency, its effect on habitability, the length of time for which it persisted, the age of the structure, the amount of the rent, the area in which the premises are located, whether the tenant waived the defects, and whether the defects resulted from abnormal or unusual use by the tenant. (*Kline v. Burns* (1971), 111 N.H. 87, 93, 276 A.2d 248, 252; *Kamarath v. Bennett* (Tex. 1978), 568 S.W.2d 658, 661; *Detling v. Edelbrock* (Mo. 1984), 671 S.W.2d 265, 270.) As noted above, not every defect or inconvenience will be deemed to constitute a breach of the covenant of habitability. The condition complained of must be such as to truly render the premises uninhabitable in the eyes of a reasonable person. *Berzito v. Gambino* (1973), 63 N.J. 460, 469, 308 A.2d 17, 22; *Park West Management Corp. v. Mitchell* (1979), 47 N.Y.2d 316, 328, 391 N.E.2d 1288, 1295, 418 N.Y.S.2d 310, 317.

As did the Pennsylvania court, we decline to establish rigid standards for determining habitability and its breach. (See *Pugh v. Holmes* (1979), 486 Pa. 272, 290-91, 405 A.2d 897, 906.) However, we think the guidelines above stated, which have been enunciated in other jurisdictions, will be helpful to the fact finder in determining the extent of the warranty of habitability and whether there has been a breach thereof in a particular case. In addition to the guidelines stated, there, of course, must be notice of the alleged defects given by the tenant to the landlord and the landlord must have had a reasonable time within which to correct the alleged deficiencies. See *Detling v. Edelbrock* (Mo. 1984), 671 S.W.2d 265, 270; *Mease v. Fox* (Iowa 1972), 200 N.W.2d 791, 797.

In the event the court, on remand, finds there has been a substantial breach of the implied warranty of habitability, it must then consider the nature of the remedy to which the tenant is entitled. Cases have traditionally looked upon a cause of action arising from such a breach as sounding in contract with basic contract remedies of damages, rescission, and reformation available. (See *Mease v. Fox* (Iowa 1972), 200 N.W.2d 791, 796; *Lemle v. Breeden* (1969), 51 Hawaii 426, 436, 462 P.2d 470, 475; see also Restatement (Second) of Property sec. 10.2, Reporter's Note, at 351-56 (1977).) Some courts have recognized a "repair and deduct remedy" in certain situations. See *Pugh v. Holmes* (1979), 486 Pa. 272, 293-94, 405 A.2d 897, 908; see also Uniform Residential Landlord and Tenant Act, 1972 Act, section 4.103 (7A Unif. Laws Ann. 541-42 (1978)); Restatement (Second) of Property sec. 5.4(2)(c) (1977).

The defendants here have counterclaimed for damages based upon the breach by the plaintiff of the implied warranty of habitability. On remand, if the court determines that there was a material breach or breaches, it must consider the damages, if any, to which the defendants are entitled. The trial court held that the defendants had been constructively evicted due to the defects in the heating system discovered in October 1981. As to the damages to be awarded if the court should find that there was a material breach of the implied warranty prior to that which constituted the constructive eviction, several methods for measuring such damages have been suggested by various courts and authors. These include "difference in value" and "percentage reduction in use." See generally Fusco, Collins & Birnbaum, *Damages for Breach of the Implied Warranty of Habitability in Illinois—A Realistic Approach*, 55 Chi.-Kent L. Rev. 337 (1979); Moskovitz, *The Implied Warranty of Habitability: A New Doctrine Raising New*

*Issues*, 62 Calif. L. Rev. 1444 (1974).

There are two varieties of the "difference in value" approach. Under the first variety the tenant's damages are measured by the difference between the *fair rental value* of the premises if they had been as warranted and their fair value during their occupancy by the tenant in the unsafe, unsanitary, or unfit condition. (*Hilder v. St. Peter* (1984), 144 Vt. 150, 478 A.2d 202; *Roeder v. Nolan* (Iowa 1982), 321 N.W.2d 1; *Park West Management Corp. v. Mitchell* (1979), 47 N.Y. 316, 391 N.E.2d 1288, 418 N.Y.S. 310; *Teller v. McCoy* (1978), 162 W. Va. 367, 253 S.E.2d 114; *Green v. Superior Court* (1974), 10 Cal. 3d 616, 517 P.2d 1168, 111 Cal. Rptr. 704; *Boston Housing Authority v. Hemingway* (1973), 363 Mass. 184, 293 N.E.2d 831; *Mease v. Fox* (Iowa 1972), 200 N.W.2d 791.) Under the second variety the tenant's damages are measured by the difference between the agreed rent and the fair rental value of the premises during their occupancy by the tenant in the unsafe, unsanitary or unfit condition. *Kline v. Burns* (1971), 111 N.H. 87, 276 A.2d 248.

The "percentage reduction in use" approach reduces the tenant's rent by a percentage reflecting the diminution in the value and enjoyment of the premises by reason of the existence of defects which give rise to the breach of the implied warranty of habitability. *Pugh v. Holmes* (1979), 486 Pa. 272, 405 A.2d 897.

As noted in the literature on the subject, both the "difference in value" method and the "percentage reduction in use" method present difficult problems in application. The "difference in value" approach, it is urged, requires the use of expert testimony which is expensive. On the other hand, the "percentage reduction in use" approach is indefinite and uncertain in that the defects do not impair an easily discernible fraction of the premises and different types of defects, although of the same degree of seriousness, do not impair the usability of the

premises uniformly. (See Note, *The Great Green Hope: The Implied Warranty of Habitability in Practice*, 28 Stan. L. Rev. 729, 761-64 (1976).) We find that the "difference in value" approach presents less difficulty in application and in most cases will lend itself to a more precise determination of the tenant's damages. However, there may be cases in which the "percentage reduction in use" approach or some other approach may be the appropriate method to use. If the "difference in value" approach is used, we find that the difference in value should be the difference between the fair rental value of the premises if they had been as warranted and the fair value of the premises in the defective condition. The agreed rent may be considered by the court as evidence of the fair rental value. (See *Hilder v. St. Peter* (1984), 144 Vt. 150, 161, 478 A.2d 202, 209.) As stated in *Park West Management Corp. v. Mitchell* (1979), 47 N.Y.2d 316, 329-30, 391 N.E.2d 1288, 1295, 418 N.Y.S.2d 310, 317, "[s]ince both sides will ordinarily be intimately familiar with the conditions of the premises both before and after the breach, they are competent to give their opinion as to the diminution in value occasioned by the breach." Also, as the Court of Appeals of New York noted in that case, in ascertaining damages, the finder of fact must weigh the severity of the violation and the duration of the conditions giving rise to the breach, as well as the effectiveness of steps taken by the landlord to abate those conditions.

The tenant is liable only for the fair rental value of the defective premises during the period of the breach of the implied warranty and is entitled to an abatement of rent in excess of that amount. If the full rent has been paid for a period for which the tenant is entitled to an abatement, damages may be awarded in his favor in that amount.

This case is here on the pleadings. Therefore, specific

issues have not been formed on several of the items we have discussed. We do not intend to establish by this opinion hard and fast rules as to the scope of the warranty of habitability, what constitutes a breach of that warranty, the relief available for such a breach, or the measure of damages. As noted earlier, these issues involve questions of fact, and each case must be determined on the issues and facts presented therein. The discussion of the issues contained in this opinion hopefully will afford guidance to the trial court on remand.

For the reasons given, the judgment of the appellate court is reversed. Also, the judgment of the circuit court of Champaign County, insofar as it dismissed the Trinkles' second affirmative defense and second counterclaim for failure to state a cause of action, is reversed. The balance of the circuit court judgment, not having been challenged, is affirmed. This cause is remanded to the circuit court of Champaign County for further proceedings in accordance with the views expressed in this opinion.

*Appellate court reversed; circuit court affirmed in part and reversed in part; cause remanded.*

JUSTICE MILLER took no part in the consideration or decision of this case.