THE HOUSING AUTHORITY OF THE CITY OF EAST ST. LOUIS, Plaintiff-Appellee, v. DORIS MELVIN, Defendant-Appellant.

Fifth District  No. 5—86—0095

Opinion filed April 28, 1987.

Nancy J. Molland and Louis Wood, both of Land of Lincoln Legal Assistance Foundation, Inc., of East St. Louis, for appellant.

Marqua McGull-Billingsley, of East St. Louis, for appellee.

JUSTICE JONES delivered the opinion of the court:

The plaintiff, the Housing Authority of the city of East St. Louis, filed a complaint in forcible entry and detainer on March 15, 1985, against Doris Melvin seeking possession of apartment 40-A, Roosevelt Homes, a public housing development located in East St. Louis, and the sum of $425.25 in rent due as well as costs. The defendant counterclaimed, seeking $1,116 and the costs of the action, alleging that, as a

result of the plaintiff's breach of the implied warranty of habitability, she had paid $1,116 in rent in excess of the value of the tenancy. In a "second counterclaim" she sought an abatement of rent in the amount of $1,116, alleging that, as a result of the plaintiff's breach of the lease, she had paid that amount in excess of the value of the tenancy. The defendant remained in possession of the premises throughout the proceedings.

A bench trial was held on July 18, 1985, of which no verbatim transcript is available. A report of the proceeding was prepared by defendant's attorney and certified as accurate by the trial court.

The evidence showed that the defendant pays $62 per month as rent, which is assessed on the basis of the tenant's income as required under a formula established by the Federal government. According to the report of proceedings, Michael Aldridge, assistant manager for the plaintiff, testified to the effect that "Ms. Melvin last paid rent in the amount of $100 in January of 1985. She owes $735 excluding court costs because she owes some back rent." The witness did not know, however, for what months the defendant owed rent. Called as an adverse witness, the defendant testified that she had resided in the apartment in question for the past 10 years and that she had last paid rent in January of 1985 but had not attempted to pay rent since that time. The apartment is a two-level four-bedroom one which she shares with her four sons.

The defendant called as a witness Waldo Dotts, a housing inspector for the city of East St. Louis, who testified that he had inspected the defendant's apartment on May 15, 1985, and had officially disapproved the unit for occupancy, having observed the following problems: no lavatory in the bathroom; ceiling plaster falling in the utility room and electrical wires hanging from the junction box; live wires hanging from the ceiling in the living room and a leaking roof in the living room; kitchen window in need of repair. He stated that the front door could not be locked because of a need for knobs and locks. At the time of the inspection workmen from the Housing Authority were exterminating in the unit. The defendant called as an adverse witness Vera DePriest, the executive director of the East St. Louis Housing Authority, who testified to familiarity of the lease in question, paragraph 10 of which provides for an "abatement of rent in proportion to the seriousness of the damage and loss in value as a dwelling in the event repairs are not made" by the management as provided in the lease. The witness testified to numerous dates, primarily in January of 1985, on which the defendant had made complaints concerning problems such as the absence of water and the running of water into the "electric box." No

workman was dispatched to investigate the complaints.

Testifying in her own behalf, the defendant stated that she is 42 years of age, that her four sons are aged 13, 14, 18, and 20, that she has been separated from her husband for eight years, and that she earns approximately $3.70 per hour as a nursing assistant at an East St. Louis hospital. She receives between $160 and $201 per month in food stamps. She described conditions in the apartment, including, *inter alia*, the presence of rats, one of which bit her 14-year-old son as he slept, another of which is pictured in a photograph included in the record on appeal, after having fallen in a bucket set out to collect water dripping from the ceiling. According to the defendant, water ran downstairs from the leaking bathtub into the utility room and into the "junction box," causing the emission of a burning odor. The defendant testified that she had stopped paying her rent after January of 1985 because she was unable to get the plaintiff to make repairs. On cross-examination she testified that she did not warn the plaintiff in advance that she would not be paying rent if repairs were not made and that she did not obtain independent estimates of the cost of repairs. She testified on cross-examination that the apartment had no water for a month in January of 1985. Some repairs to the apartment have been made.

In its judgment, entered October 3, 1985, the trial court found that "[r]ent payable during the period in issue was at the rate of $62.00 per month (which translates to $2.06 per day), an extremely low rental in or out of the real estate rental market, and represents a reasonable rental value of the premises before, after, and during the breach of warranty as hereinafter stated." The trial court found further that the plaintiff "failed to maintain the demised premises pursuant to the Management's Obligations paragraph [paragraph eight] of the lease, and, as a result, defects of a substantial nature rendered the premises unsuitable for occupancy, thereby breaching the warranty of habitability." The court found "[t]hat said breach of the warranty of habitability constituted a constructive eviction of the defendant by plaintiff, but, nevertheless, the defendant has chosen to and has continued to and still resides in the said apartment, and has made no rent payment to plaintiff since paying $100 on January 10, 1985, and there remains a present balance of $735.25 arrearage of rents unpaid." The court found the case of *Glasoe v. Trinkle* (1985), 107 Ill. 2d 1, 479 N.E.2d 915, to be of limited application to the instant case since the defendant in *Glasoe* had vacated the premises upon the occurrence of the conditions constituting a breach of the warranty of habitability by the landlord and *Glasoe* involved a rental agreement between individuals in the

private sector, "a more commercial landlord-tenant relationship than the one under consideration involving a public housing authority in which the method of determining rentals to be charged is based upon income to accommodate low to modest income individuals—a unique relationship involving public policy issues, as distinguished from the instant case." The court stated that if the implied warranty is found to be breached, the tenant who remains in possession is liable for "the reasonable (rental) value of the premises" and that "[t]he rent charged defendant before, during, and after the breach of warranty is even less than the fair rental value." Judgment was entered for the plaintiff and against the defendant in the sum of $735.25 plus costs and against the defendant-counterplaintiff upon her counterclaims.

In a post-trial motion the defendant stated that the court in its judgment did not discuss the issue of damages resulting from the breach of the terms of the lease, that the court had found that the plaintiff-counterdefendant had failed to maintain the apartment pursuant to the lease, and that the defects were so substantial that the unit was rendered unsuitable for occupancy. The defendant stated further in her post-trial motion:

"7. Paragraph ten of the lease provides that when defects are hazardous to life, health, and safety of the occupants, the tenant is entitled to an abatement in rent in proportion to the seriousness of the damage and loss in value as a dwelling ***.

8. Under the above terms of the lease, the court is required to use the 'percentage reduction in use' method (rent paid by tenant reduced by a percentage due to defects) to calculate damages rather than the 'difference in value' approach (fair rental value as warranted or agreed rent less the actual value with defects).

9. The evidence at trial showed that the percentage of loss of use of the apartment was between 75% and 100%."

The defendant asked that the trial court calculate damages for the breach of the terms of the lease by the "percentage reduction in use" method. The defendant stated further that "[w]ithout set-off or abatement for conditions, the rent owing as of the date of trial would be $372 (six months rent at $62 per month) rather than $735.25 as entered in the Judgment" and that the plaintiff-counterdefendant had failed to prove what additional payments, if any, were due. She asked that the court reduce the amount of the judgment from $735.25 to $372 prior to any setoff or abatement. In its order denying the post-trial motion the trial court found, following a hearing, that although there was sufficient allegation of violation of the lease agreement to

form the basis for consideration of abatement of rent and setoff against the claim for money, the evidence did not establish the values required to find the amount. The court found as follows:

"Defendant's counterclaim does not ask for damages calculated by the 'percentage reduction in use method.' This appears for the first time in the post trial motion. The First Counterclaim presents a difference in value measure of recovery, and is based upon *implied warranty of habitability* and *not* upon the lease provisions. The court finds no evidence was presented to form the basis for valuing the tenancy to determine an amount of rent paid in excess of the value. The 'difference in value' remedy is the difference between the fair rental value of the premises if they had been as warranted, and the fair rental value of the premises in the defective condition. As indicated in the Court's judgment, however, the method of ascertaining rentals of Housing Authority units has nothing to do with fair rental value. There is no evidence in this case upon which to base a finding.

The Second Counterclaim is similar to the 'difference in value' approach in the First Counterclaim, and proof is deficient." (Emphasis in original.)

The court found that paragraphs seven and eight of the post-trial motion were not pleaded and that paragraph nine of the motion "alludes to evidence given that was not factual, but was a conclusion as to percentages." With regard to any reduction of the amount of the judgment, the court stated that the delinquency in rent on February 7, 1985, was in the amount of $425.25 to which five months of rent at $62 per month should be added as of the date of trial for a total of $735.25.

On appeal the defendant presents two issues: (1) whether, pursuant to paragraph 10 of the lease, she is entitled to an abatement of rent in proportion to the seriousness of the damage and loss of use as a dwelling and (2) whether, pursuant to paragraph eight of the lease, she is entitled to damages calculated under the "percentage reduction in use" approach. Paragraph eight of the lease provides, *inter alia,* that

"Management shall (a) maintain the premises and the development in a decent, safe and sanitary condition; (b) comply with requirements of applicable building codes, housing codes and HUD regulations, materially effecting [*sic*] health and safety; (c) make necessary repairs to the premises; (d) keep project buildings, facilities and common areas, not otherwise assigned to the Tenant for maintenance and upkeep in a clean and safe condi-

tion; (e) maintain in good and safe working order and condition electrical, plumbing, sanitary, heating, ventilating and other facilities and appliances, including elevators, supplied or required to be supplied by Management."

Paragraph 10 of the lease provides:

"The rights and obligations of the Tenant and Management in the event that premises are damaged to the extent that conditions are created that are hazardous to life, health or safety of the occupants are as follows: (a) the Tenant shall immediately notify project management of the damage; (b) Management shall be responsible for repair of the unit within a reasonable time: Provided, That if the damage was caused by the Tenant, Tenant's household or guests, the reasonable cost of the repairs shall be charged to the Tenant; (c) Management shall offer standard alternative accommodations, if available, in circumstances where necessary repairs cannot be made within a reasonable time; (d) Tenant shall be entitled to abatement of rent in proportion to the seriousness of the damage and loss in value as a dwelling in the event repairs are not made in accordance with sub-paragraph (c) [sic] of this paragraph, except that no abatement of rent shall occur if the Tenant rejects the alternative accommodations or if the damage was caused by the Tenant, Tenant's household or guests."

■ In *Glasoe v. Trinkle* the court held that the implied warranty of habitability applies to all leases of residential real estate regardless of the existence of housing or building codes. The tenants there claimed that if the unit, which was a private dwelling, had been in a habitable condition, the fair rental value of the unit would have been equal to the rent they had agreed to pay, and they alleged that the proper rental value of the unit in its actual condition throughout the tenancy had been an average of 60% of the agreed rental. They counterclaimed for the difference between the aggregate rent they had paid and the aggregate proper rental value, basing their claim upon the breach by the plaintiff of the implied warranty of habitability. The supreme court remanded the cause to the trial court for a determination of whether there had been a substantial breach of the implied warranty of habitability and, if the court so found, for a determination of the damages, if any, to which the tenants were entitled. The court in *Glasoe* discussed at length the determination of such damages:

"As to the damages to be awarded if the court should find that there was a material breach of the implied warranty prior to that which constituted the constructive eviction [found by the

trial court], several methods for measuring such damages have been suggested by various courts and authors. These include 'difference in value' and 'percentage reduction in use.' See generally Fusco, Collins & Birnbaum, *Damages for Breach of the Implied Warranty of Habitability in Illinois—A Realistic Approach*, 55 Chi.-Kent L. Rev. 337 (1979); Moskovitz, *The Implied Warranty of Habitability: A New Doctrine Raising New Issues*, 62 Calif. L. Rev. 1444 (1974).

There are two varieties of the 'difference in value' approach. Under the first variety the tenant's damages are measured by the difference between the *fair rental value* of the premises if they had been as warranted and their fair value during their occupancy by the tenant in the unsafe, unsanitary, or unfit condition. [Citations.] Under the second variety the tenant's damages are measured by the difference between the agreed rent and the fair rental value of the premises during their occupancy by the tenant in the unsafe, unsanitary or unfit condition. [Citation.]

The 'percentage reduction in use' approach reduces the tenant's rent by a percentage reflecting the diminution in the value and enjoyment of the premises by reason of the existence of defects which give rise to the breach of the implied warranty of habitability. *Pugh v. Holmes* (1979), 486 Pa. 272, 405 A.2d 897.

As noted in the literature on the subject, both the 'difference in value' method and the 'percentage reduction in use' method present problems in application. The 'difference in value' approach, it is urged, requires the use of expert testimony which is expensive. On the other hand, the 'percentage reduction in use' approach is indefinite and uncertain in that the defects do not impair an easily discernible fraction of the premises and different types of defects, although of the same degree of seriousness, do not impair the usability of the premises uniformly. (See Note, *The Great Green Hope: The Implied Warranty of Habitability in Practice*, 28 Stan. L. Rev. 729, 761-64 (1976).) We find that the 'difference in value' approach presents less difficulty in application and in most cases will lend itself to a more precise determination of the tenant's damages. However, there may be cases in which the 'percentage reduction in use' approach or some other approach may be the appropriate method to use. If the 'difference in value' approach is used, we find that the difference in value should be the difference between the fair rental value of the premises if they had been as warranted and the fair value of the premises in the defective condition. The agreed rent

may be considered by the court as evidence of the fair rental value. [Citation.] As stated in *Park West Management Corp. v. Mitchell* (1979), 47 N.Y.2d 316, 329-30, 391 N.E.2d 1288, 1295, 418 N.Y.S.2d 310, 317, '[s]ince both sides will ordinarily be intimately familiar with the conditions of the premises both before and after the breach, they are competent to give their opinion as to the diminution in value occasioned by the breach.' Also, as the Court of Appeals of New York noted in that case, in ascertaining damages, the finder of fact must weigh the severity of the violation and the duration of the conditions giving rise to the breach, as well as the effectiveness of steps taken by the landlord to abate those conditions.

The tenant is liable only for the fair rental value of the defective premises during the period of the breach of the implied warranty and is entitled to an abatement of rent in excess of that amount. If the full rent has been paid for a period for which the tenant is entitled to an abatement, damages may be awarded in his favor in that amount." (Emphasis in original.) 107 Ill. 2d 1, 15-17, 479 N.E.2d 915, 921-22.

With regard to the nature of the premises in question as public housing, we find instructive the comments of the court in *Housing Authority v. Scott* (1975), 137 N.J. Super. 110, 117-18, 348 A.2d 195, 199, in which the defendant tenant of public housing asserted a breach by the plaintiff landlord of the implied warranty of habitability and was allowed an abatement of rent equal to approximately 30% of the back rent due:

"We reject also the contention that the abatement should be taken from a 'fair rental value' determined on the basis of assumed free-market forces in the 'private sector,' as distinguished from the rent fixed within the maximum levels established under governmental guidelines. 42 U.S.C.A sec. 1402(1) This is as inappropriate as it is to suggest that a tenant who is dissatisfied should move out. [Citations.] The premise of public housing is to furnish decent housing for the needy—the poor and the aged with limited income—where such housing is nonexistent or in short supply. It would frustrate this objective to allow a 'rebate' against a higher, theoretical rent which would result in requiring the tenant to pay the original rent for substandard housing."

■■ ■ Although the defendant-counterplaintiff in her appeal seeks an abatement in rent on the basis of a breach of the terms of the lease rather than on the basis of a breach of the implied warranty of habit-

ability, we think that this is a case in which the "percentage reduction in use" method is the appropriate method for determining the abatement, if any, to which she is entitled because the rent she pays for public housing, calculated on the basis of her income, bears no relation to the fair rental value of the premises. Therefore, we remand the cause to the trial court for a determination of any abatement of rent to which she may be entitled under the "percentage reduction in use" method, which, we think, accords with the provision of paragraph 10 of the lease that "in the event premises are damaged to the extent that conditions are created that are hazardous to life, health, or safety *** Tenant shall be entitled to abatement of rent in proportion to the seriousness of the damage and loss in value as a dwelling in the event repairs are not made ***." In this instance, in accord with the terms of the lease, the seriousness of the damage and loss in value as a dwelling when repairs are not made to correct conditions hazardous to life, health, and safety shall form the basis of any percentage reduction in use to which the appellant may be entitled. As the Supreme Court of Illinois suggested in *Glasoe,* and the Supreme Court of Pennsylvania stated in *Pugh v. Holmes* (1979), 486 Pa. 272, 405 A.2d 897, an advantage of the "percentage reduction in use" method is that the need for costly expert testimony is greatly reduced since the determination of a percentage reduction in use of a residential dwelling is a matter within the capability of a layman.

In its brief the appellee asserts that the appellant is not entitled to an abatement in rent because she failed to exhaust all remedies available in her lease, and the appellant replies that, pursuant to 24 C.F.R. secs. 966.55(c) and 966.57(c) (1986), she was not required to do so. Although there is a finding in the judgment of the trial court that the "Defendant has not exercised its administrative remedies provided in paragraph 15 of the lease," the record does not indicate that the issue of whether she was required to do so was litigated in the trial court. Hence, we do not consider it.

Reversed and remanded.

KARNS, P.J., and WELCH, J., concur.