NOTICE
Decision filed 08/26/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230627-U

NO. 5-23-0627

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

___

| | | |
|---|---|---|
| CARLTON GILMORE, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff and Counterdefendant-Appellant, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 23-EV-394 |
| | ) | |
| LAFAYETTE KENNEL, | ) | Honorable |
| | ) | Patrick R. Foley, |
| Defendant and Counterplaintiff-Appellee. | ) | Judge, presiding. |

___

JUSTICE MOORE delivered the judgment of the court.
Justices Cates and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The July 28, 2023, and August 24, 2023, judgments of the trial court are reversed and vacated as the finding that the implied warranty of habitability was breached beginning on April 1, 2021, was against the manifest weight of the evidence.

¶ 2    The plaintiff and counterdefendant, Carlton Gilmore, appeals the July 28, 2023, and August 24, 2023, judgments of the circuit court of St. Clair County that found in favor of the defendant and counterplaintiff, Lafayette Kennel. For the reasons that follow, we reverse and vacate the trial court's judgments.

¶ 3                                   I. BACKGROUND

¶ 4    On March 20, 2023, Gilmore filed a *pro se* complaint in forcible entry and detainer against Kennel. The complaint alleged that Gilmore was entitled to possession of the premises located at 432 North 22nd Street located in East St. Louis, IL, that Kennel was unlawfully withholding

1

possession of the premises, and that Kennel owed Gilmore rent in the amount of $1400. The relief requested in Gilmore's complaint was for possession of the described premises and "for the sum of $0." Gilmore's complaint did not seek unpaid rent and it did not have the requisite affidavit for unpaid rent. Gilmore attached the five-day notice to quit to the complaint; however, Gilmore did not attach a lease document to the complaint.

¶ 5    On May 4, 2023, counsel entered an appearance on behalf of Kennel and filed a verified answer, affirmative defense, and counterclaim. Kennel denied the allegations of Gilmore's complaint. Further, Kennel asserted an affirmative defense and counterclaim for breach of the implied warranty of habitability. Kennel's verified counterclaim alleged, *inter alia*, that the implied warranty of habitability was breached due to major electrical issues, major roof damage, lack of insulation, improperly installed doors, flooring issues, chimney issue, and rodent issues. Kennel's counterclaim requested money damages for rents paid when the fair rental value of the property was zero due to its condition, an injunction requiring Gilmore to make all necessary repairs to keep the property in compliance with all state and local building codes, and for punitive damages.

¶ 6    On May 12, 2023, Gilmore's complaint was dismissed for want of prosecution when he failed to appear for the scheduled bench trial date. On June 7, 2023, Gilmore filed a two-page handwritten pleading titled, "Motion." The trial court interpreted the *pro se* motion as a motion to reinstate Gilmore's complaint and conducted a hearing on said motion on June 23, 2023. At the hearing, Gilmore testified that he mistakenly read the handwritten date of the previously scheduled bench trial as May 17 and not May 12, which is why he failed to appear. Counsel for Kennel did not object to the reinstatement of the original complaint but did object to any new allegations that were made at the hearing and in the motion that were beyond the original complaint. The trial court

reinstated the original complaint after striking all allegations of lease violations that were orally presented at the hearing.

¶ 7    Gilmore filed a verified answer to Kennel's counterclaim on June 7, 2023. Notably, Gilmore's answer admitted the following allegations of the verified counterclaim:

"9. In this case the Premises is in violation of the warranty of habitability because the following conditions make the home unsafe, unsanitary, and unfit for occupancy:

a. Major electrical issues that make the home unsafe, including but not limited to, electrical wires not properly encased in walls, extension cords being used as the primary electric access in various rooms, faulty wiring in light fixtures, regular junction box issues, dryer sparks when in use;

b. Major roof damage that causes multiple leaks in multiple rooms in the Premises;

c. Lack of insulation;

d. Improperly installed doors;

e. Flooring issues;

f. Chimney fell on or around April 26, caused by the storm; and

g. Rodent issues.

* * *

12. Counter Defendant installed the electric wires that are not properly encased in the walls.

13. Counter Defendant has had a reasonable amount of time to correct the deficiencies and has not done so."

¶ 8    The matter proceeded to a bench trial on all claims on July 28, 2023. The bench trial began with Gilmore presenting his claim for eviction. Gilmore was the only witness to testify in support

3

of his claim for eviction. As Gilmore was *pro se*, he was examined by the trial court and then presented his own testimony. Gilmore testified that he was the owner of the property located at 434 North 22nd Street in East St. Louis in St. Clair County. Kennel was the tenant at this property. Gilmore testified that Kennel signed a 12-month lease, and the monthly rent was $500. Although the testimony regarding the start date of the lease was not completely clear,[1] the trial court concluded that the lease term ran from April 1, 2021, through March 31, 2022. The lease did not contain a provision for renewal or extension.

¶ 9    After the lease expired, Kennel remained in possession of the premises and Gilmore continued to accept rent payments from Kennel. Gilmore testified that Kennel paid the monthly rent from July 2021 through December 2022. He testified that 15 of those 18 months, Kennel paid the full $500. He further explained that for 3 of those months he may have been short $30 or $40 of the full rent. Gilmore testified that Kennel has not paid any rent since December 2022.

¶ 10    Gilmore presented plaintiff's exhibit 1 to the court and moved for its admission. Gilmore explained that exhibit 1 was "a copy of the leases that I give my tenants. The lease that he agreed upon." Plaintiff's exhibit 1 was not signed by Gilmore or Kennel. When the court inquired if the document was signed by the parties, Gilmore stated, "No it's not, there is no lease, it's just a copy. It's just a copy. Because when I told him to also make a copy of the lease and give it back to me when he got the utilities on he never gave that back as well." Kennel objected to the admission of plaintiff's exhibit 1 because the alleged lease was not attached to the complaint or in subsequent filing. The trial court sustained the objection.

---

[1]Gilmore initially testified that the lease went into effect in July 2021, but later stated that it could have been April 2021. Kennel testified that he moved into the property in April 2021. Kennel was not asked about the starting date and ending date of the lease.

¶ 11    Gilmore testified that he served a five-day notice on Kennel in March. He testified that he did not know if he gave the five-day notice to Kennel, but he did show it to Kennel while he was at work. Gilmore testified that the five-day notice said Kennel needed to pay rent within five days or he would be served with the 30-day eviction notice. Gilmore's requested relief was for Kennel to vacate the premises and possession be returned to Gilmore within two weeks. This concluded the questioning of Gilmore by the court.

¶ 12    Next, Gilmore presented the following. Gilmore stated that the lease contained a provision for a late fee of $10 per day after being three days late. Kennel objected to this testimony as Gilmore was testifying to the terms of a written document that was not admitted into evidence. The court sustained the objection.

¶ 13    Gilmore testified that he was seeking possession only and he was not seeking any monetary damages. Gilmore stated he wanted to explain what had happened leading up to the suit. He testified that Kennel went from paying 7 to 8 days late, to 15 to 20 days late. Gilmore stated that Kennel damaged the property, an objection was made as to relevance, which was sustained. Next, he wanted to show a video about dogs, but again, it was deemed not relevant.

¶ 14    On cross-examination, Gilmore testified that he placed four tarps on the roof of the premises in October 2022. Gilmore agreed that Kennel paid $500 rent in November and December 2022; however, none of that money was used to pay a roofer for repairs to the roof. Gilmore explained that in October 2022, he told Kennel to try and find another place to live because Gilmore was going to board up the home in April or May of 2023. When asked what he meant by boarding up the house, Gilmore stated, "I mean I told him to try and find another place to live because I wasn't going to deal with the house anymore because all I got was turmoil and constant

5

complaining and arguing and bickering. So, I told him would you please try to find somewhere to go because I'm not going to even deal with the house. I'm done and I'm going to board it up."

¶ 15    Gilmore testified that he owned another rental house in Granite City. He stated he had hired contractors to perform work at the Granite City house. This concluded the cross-examination by Kennel.

¶ 16    The trial court then gave Gilmore the opportunity to respond and provide any clarification. Gilmore testified that he did not have problems with the tarp on the roof in the wintertime. This led to additional questions from the court and the following testimony from Gilmore. Gilmore stated the house needs a new roof. Prior to Kennel moving in, the house passed an inspection with the City of East St. Louis. Gilmore testified that Kennel knew the tarp was on the roof when he moved in. Additionally, Gilmore testified as follows:

"When he came the tarp was on the roof. I told him it was on one side that it was bad. And when the inspector came he said hey, you can't have that tarp on the roof. He said you got to take that tarp off before I can pass the inspection. So I took the tarp off. He passed the inspection. He knew that the tarp was up there. I put the tarp back on, after the house passed the inspection I put the tarp back on. And he knew that the—he was very aware. And he still pursued me for two months trying to rent my house because he was staying in a hotel, a motel or hotel."

The court inquired of Gilmore if the roof leaked when it rained. Gilmore stated,

"As long as there was a tarp up there it was okay. But with the sun and the rain the tarp would expire maybe after three months, two and a half, three months the tarp would expire. But I put like four of them up there. Each and every time he told me it was leaking if he needed a tarp I would pay John to put a tarp on. I would pay John to put a tarp on. And it

6

started to just get to where I was putting them on too fast, that's when I told him I said hey, it wasn't even an issue when I told him. All the complaining I said, I told him cuz [*sic*] I'm going to just be done with this house."

¶ 17 Next, Gilmore testified that Kennel was living with his girlfriend the majority of the time, but he does stay at the premises at times. Kennel also still had personal property at the premises. Gilmore rested his case following his testimony.

¶ 18 After Gilmore rested, Kennel moved for judgment in his favor on the issue of Gilmore's claim for possession. After hearing arguments from the parties, the court granted the motion. The court found that "[b]ased upon the testimony that's been tendered to the court as well as the evidence submitted the court grants the motion for judgment on the pleadings and denies the relief sought by plaintiff in his complaint which is for possession based upon the admissions in the answer, based upon the testimony and that's it."

¶ 19 Next, Kennel presented testimony in support of his counterclaim. Kennel testified that he moved into the premises in the middle of April 2021. He paid monthly rent of $500 through December 2022. Kennel identified a series of photographs of the premises which were marked as exhibits and entered into evidence. Exhibit C and D depicted a torn up sidewalk and bricks out of place along the front pathway as well as a dry rotted handrail. Exhibit E depicted the bedroom door that had a gap of several inches at the bottom of the door and no doorknob. Additional photograph exhibits were admitted showing the poor condition of the premises. Additionally, a video exhibit was played showing a leak from the roof into the bathroom. Exhibits N and O depicted a hole in the ceiling from the drywall collapsing. Kennel testified that the roof leaked when it rained and the electrical wiring in the home had issues as half of the sockets did not work. He also testified to insulation and rodent problems.

¶ 20    Kennel testified that he made multiple requests for Gilmore to repair the premises. Kennel testified that Gilmore would show up when it was time to collect rent and tell him he would send someone to make repairs, but it did not happen.

¶ 21    Gilmore cross-examined Kennel. On cross-examination, Kennel testified that if a repair person was sent, it was "later in the afternoon, ten and eleven o'clock and I wouldn't let no one in the house after those type of hours." Kennel also testified that when he first moved into the house it looked good cosmetically, but the problems then became apparent.

¶ 22    After completing the cross-examination of Kennel, Gilmore testified in response to the counterclaim. As Gilmore was *pro se*, the trial court explained this was his opportunity to tell his side of the story regarding the counterclaim and request for damages. Gilmore testified, *inter alia*, as follows:

> "Okay, Your Honor. There are accumulating problems with of course rain that's going to cause damage. I haven't spoke [*sic*] to Mr. Kennel since like the first week of January. Which I had no problems with fixing the problems. Mr. Kennel told me when I showed him the papers that he had two thousand dollars at home. I'm going to front you this before he said I'm going to take it to court. He said I'll give you the money but I want you—he tried to direct me how to go about fixing the property. I want to see licensed people to fix the problem, this is how he addressed me trying to tell me how to go about repairing my home which I thought was you don't tell me how to go—as long as the job gets done and it's efficient you don't tell me how to go about it. So that's where the argument came in.
>
> After that last day I seen Mr. Kennel we had no more talking, discussions as far as my house. He never called me one time. Which I knew that the roof was damaged and there was—I knew that the roof was tearing up the (inaudible word). And believe me I wanted

8

to go over there but I had about three or four months I had gotten behind on my own home. And as he said he's a single father, I'm a single dad, I lost my wife in 2015. So I've been a single dad to my sixteen year old for some time now. And I try to tell him hey, it looks if people, when you give me five hundred dollars it looks like you're giving me a lot of money but after I do repairs, after I pay the taxes and all of that I'm not really making much you know which I tried to bring to his attention. So of course I said we've got to work together on things. You know I'm trying to do things for this house. I'm trying to do things for my home and then I have other responsibilities because at that time I had two properties. I'm down to just his house and another house. And I told him I was trying to fix the house in Granite because I told him I said I'm trying to fix this house because if I can get the repairs done and get people in this house I can pay for the home, for the home there."

During his testimony, Gilmore stated, "Why should I be punished for you staying in a house that you know is unfit when you've had all the ample time to save to move on."

¶ 23    Following the completion of Gilmore's testimony, the court took the matter under advisement. A written order was entered on July 28, 2023, memorializing the judgment in favor of Kennel on Gilmore's claim for possession. The court found that the claim for possession was denied, and Kennel could not be evicted because "no rent was owed at the time the 5 day notice was served due to breach of implied warranty of habitability."

¶ 24    On August 24, 2023, the court entered a written judgment on the counterclaim. The judgment found that from April 2021, through the time of trial, there were defects at the premises that rendered it uninhabitable. The court found that the fair market rental value of the premises from April 2021 through the time of trial was $0. Further, the court found that Gilmore admitted that prior to leasing the premises, he was told by a code enforcement official that the residence

9

would not pass inspection with a tarp on the roof, so he removed it for the inspection, and then replaced it. The court found that Gilmore's failure to make repairs to the premises was "characterized by willfulness, recklessness, and malice in disregard for the rights and wellbeing of Kennel." The judgment found in favor of Kennel's counterclaim, and he was awarded $10,500 as reimbursement for overpaid rent in the amount of $500 monthly from April 2021 through December 2022, punitive damages in the amount of $5250, and the prayer for injunctive relief was granted ordering Gilmore to make all necessary repairs. The same day, Gilmore filed a timely notice of appeal.

¶ 25                                    II. ANALYSIS

¶ 26    On appeal, Gilmore claimed, *inter alia*, that Kennel failed to present sufficient evidence to prove the necessary elements of a claim for breach of the implied warranty of habitability, and therefore, that the judgment and the award of damages, punitive damages, and injunctive relief must be reversed. The implied warranty of habitability requires that a dwelling be reasonably fit for its intended use; that is, habitable and suitable for living. *Glasoe v. Trinkle*, 107 Ill. 2d 1, 13 (1985). In the landlord-tenant context, the implied warranty of habitability applies to leases of multiple-unit dwellings (*Jack Spring, Inc. v. Little*, 50 Ill. 2d 351 (1972)) and single-family dwellings (*Pole Realty Co. v. Sorrells*, 84 Ill. 2d 178 (1981)). It applies to all leases of residential real estate regardless of the existence of housing codes or building codes. See *Glasoe*, 107 Ill. 2d at 10. "The warranty requires that at the inception of the lease there be no latent defects in those facilities vital to the use of the dwelling for residential purposes and vital to the life, health, and safety of the tenant and that the premises will remain habitable throughout the term of the lease." *Glasoe*, 107 Ill. 2d at 13; *Jack Spring, Inc.*, 50 Ill. 2d at 365.

10

¶ 27 To constitute a breach of the implied warranty of habitability, the defect must be of such a substantial nature as to render the premises unsafe or unsanitary, and thus unfit for occupancy. *Glasoe*, 107 Ill. 2d at 13. The tenant must give the landlord notice of the alleged defects and the landlord must have a reasonable opportunity to correct those defects. *Glasoe*, 107 Ill. 2d at 14. In determining whether there has been a breach of the implied warranty of habitability, courts have considered various factors, including the nature of the deficiency, its effect on habitability, the length of time for which it persisted, the age of the structure, the amount of the rent, the areas in which the premises are located, whether the tenant waived the defects, and whether the defects resulted from abnormal or unusual use by the tenant. *Glasoe*, 107 Ill. 2d at 14. Not every defect will be deemed to constitute a breach of the warranty, and the conditions complained of must render the premises uninhabitable in the eyes of a reasonable person. *Glasoe*, 107 Ill. 2d at 14. Whether there has been a breach of the warranty is a question of fact to be determined on a case-by-case basis. *Glasoe*, 107 Ill. 2d at 13.

¶ 28 The case law has traditionally found that a cause of action arising from a breach of implied warranty of habitability sounds in contract with basic contract remedies of damages, recission, and reformation available. *Glasoe*, 107 Ill. 2d at 15. There are several methods for measuring damages, including the difference-in-value approach and the percentage-reduction-in-use approach. *Glasoe*, 107 Ill. 2d at 15. In this case, the trial court calculated damages using the difference-in-value approach.[2] Under this approach, the damages are measured by the difference between the fair rental value of the property if it had been as warranted and its fair value during occupancy by the tenant in the defective condition. *Glasoe*, 107 Ill. 2d at 17. The agreed rent may be considered as

_____

[2]Although Kennel asserted that the percentage-reduction-in-use method was the proper approach to evaluate damages, the trial court applied the difference-in-value approach in the judgment. Kennel did not file a cross-appeal challenging the trial court's decision.

11

evidence of the fair rental value. *Glasoe*, 107 Ill. 2d at 17. The tenant is liable for the fair rental value of the defective premises during the period of the breach of the implied warranty, and he is entitled to an abatement of rent in excess of that amount. If the full rent was paid for a period for which the tenant was entitled to an abatement, damages may be awarded to the tenant in that amount. *Glasoe*, 107 Ill. 2d at 17. Because the landlord and the tenant would ordinarily be familiar with the conditions of the premises both before and after the breach, they would be competent to give an opinion as to the diminution in value occasioned by the breach. *Glasoe*, 107 Ill. 2d at 17. In ascertaining damages, the finder of fact must weigh the severity of the violation and the duration of the conditions giving rise to the breach, as well as the effectiveness of the steps taken by the landlord to abate these conditions. *Glasoe*, 107 Ill. 2d at 17.

¶ 29　The standard of review in a bench trial is whether the trial court's judgment is against the manifest weight of the evidence. *Camelot, Inc. v. Burke, Burns & Pinelli, Ltd.*, 2021 IL App (2d) 200208, ¶ 50; *Avenaim v. Lubecke*, 347 Ill. App. 3d 855, 861 (2004). A judgment is against the manifest weight of the evidence when the opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *Camelot, Inc.*, 2021 IL App (2d) 200208, ¶ 50; *Avenaim*, 347 Ill. App. 3d at 861. Likewise, a reviewing court will not disturb the trial court's findings as to damages unless those findings are against the manifest weight of the evidence. See generally *Meade v. Kubinski*, 277 Ill. App. 3d 1014, 1018 (1996). A damages award is against the manifest weight of the evidence where the trial court ignored the evidence, or its measure of damages was erroneous as a matter of law. *1472 N. Milwaukee, Ltd. v. Feinerman*, 2013 IL App (1st) 121191, ¶ 13; *Meade*, 277 Ill. App. 3d at 1018. An award of damages is not against the manifest weight or manifestly erroneous if there is an adequate basis in the record to support the trial court's determination of damages. *Feinerman*, 2013 IL App (1st) 121191, ¶ 13.

12

¶ 30   In this case, we find there was not an adequate basis in the record to determine when the breach of the implied warranty of habitability arose. While Gilmore did make binding judicial admissions in his verified answer that conditions existed that breached the implied warranty of habitability, neither the verified counterclaim nor the testimony clearly established the date of onset and the duration of the conditions that rendered the premises uninhabitable. Accordingly, Kennel failed to prove that he was entitled to reimbursement for overpayment of rent from the beginning of the lease in April 2021 through December 2022.

¶ 31   During his case-in-chief, Kennel testified generally about the conditions identified in his counterclaim, including the electrical wiring issues, the roof, the chimney, ill-fitting doors, and rodents. Kennel did not clearly identify which of the defective conditions rendered the residence uninhabitable, and he did not testify that the residence was uninhabitable on the first day of his tenancy. He provided vague answers as to when the residence became unfit for occupancy. During his testimony, Kennel relied primarily on recent photographs and videos as evidence of the various conditions that he claimed made the rental property unfit for occupancy. Kennel's counsel asked Kennel about dozens of photographs. Counsel would show Kennel a photograph, and then ask whether that photograph depicted a particular condition of the rental premises. Kennel provided general responses to his counsel's questions about the conditions depicted and when they arose. Kennel also acknowledged that he was not concerned with some of the conditions noted by his counsel. Kennel did not identify the date when the photographs were taken. With a few exceptions, the photographs did not contain a date stamp indicating when they were taken. Kennel occasionally testified about the source of a photo or a video. By way of illustration, the following exchange took place near the beginning of Kennel's direction examination:

13

"MR. GRAHAM (Kennel's Counsel): Mr. Kennel, I'm handing you what I've got marked as Defendant's Exhibit C. Do you recognize this as just a zoom in of the last picture I showed you?

KENNEL: Uh huh. That's how it looked when I moved in.

* * *

MR. GRAHAM: Is the sidewalk torn up, were those bricks out of place? When you moved in, were those bricks out of place?

KENNEL: Yes. That wasn't even my concern. I just needed a place to move my son. I just wanted somewhere stable for him to lay his head.

MR. GRAHAM: I move Defendant's Exhibit C into evidence.

THE COURT: Any objections to exhibit C being admitted? It's a close up of exhibit B it looks like.

MR. GILMORE: No. Yeah, but those bricks wasn't like that when he moved in there. There wasn't bricks, that's marble that the man did but they wasn't looking like that.

THE COURT: So I'm going to admit it over your objection but here's what I want you to do. All of these exhibits, even if you object, that's not a valid objection for me to keep it out. So if you dispute what this is, the date, whatever you tell me when you testify again, okay?

MR. GILMORE: Okay."

¶ 32     A second example of Kennel's failure to properly identify the conditions which contributed to the uninhabitability of the rental properly is evident through his testimony regarding a photograph of the front door and exterior handrail.

"KENNEL: Yeah, that's the handrail. It dry rotted to the core. So it's been removed since then. But yeah, it came up. So I just pushed it on over so wouldn't nobody else try to grab it.

MR. GRAHAM: How long ago was that?

KENNEL: It's been a few months.

* * *

MR. GRAHAM: Your Honor I move to—

14

KENNEL: It was like the summer of last year.

MR. GRAHAM:—Defendant's Exhibit D into evidence.

THE COURT: Any objections.

MR. GILMORE: I object.

THE COURT: On what grounds?

\* \* \*

MR. GILMORE: Summer of last year. No, it just had to recently happen with that—

THE COURT: All right, that's not a valid objection. You've got to point that out when you testify. But I'm going to note that you object and I'm going to admit it over objection."

¶ 33    This testimony does not establish that the defective condition of the handrail was of such a substantial nature as to render the property unsafe, and thus unfit for occupancy. A review of the record reveals that throughout the direct examination, Kennel's counsel led his client through this type of general questioning as to dozens of photographs and five video clips. Without some indication of when the photographs were taken and whether the conditions depicted in the photograph rendered the property unfit for occupancy, there was insufficient evidence to support the trial court's finding that the rental property was uninhabitable from the beginning of the lease in April 2021.

¶ 34    On Gilmore's claim for possession, the trial court entered a directed verdict against Gilmore at the close of Gilmore's case-in-chief, finding that "no rent was owed at the time the 5-day notice was served due to a breach of the implied warranty of habitability." At that point in the proceedings, the trial court had received no evidence that the property's fair rental value was $0. The trial court's judgments comingled the issues of possession and the implied warranty of habitability.

15

¶ 35    On this record, we find that Kennel failed to present competent and adequate evidence to prove that the residence was unfit for occupancy and had a fair rental value of $0 as of day one of the tenancy. Therefore, Kennel failed to establish that he was entitled to reimbursement of his rent from April 2021 through December 2022. The evidence as to the onset and duration of the conditions that made the residence uninhabitable was insufficient to support the trial court's calculation of damages. Kennel's continued possession and refusal to move from the residence raises fair questions about when the residence became uninhabitable and whether the fair rental value of the property was truly $0, and these questions were not answered during these proceedings.

¶ 36    Based on the foregoing, we vacate the judgment of August 24, 2023, which found, *inter alia*, that the implied warranty of habitability was breached beginning on the date the lease began, April 1, 2021, as this finding was against the manifest weight of the evidence. We also vacate the July 28, 2023, judgment which denied Gilmore's request for possession based on the finding that no rent was owed due to the breach of the implied warranty of habitability as this finding was also against the manifest weight of the evidence due to the date of the breach not being established by the evidence.

¶ 37    We remand this matter to the trial court for a new trial on Gilmore's complaint for possession and for Kennel's counterclaim for breach of the implied warranty of habitability. The damage awards, including punitive damages, and injunctive relief are vacated. Based on the foregoing, we do not consider the evidentiary challenge Gilmore has raised on appeal at this time. We note that any judicial admissions made in the original verified pleadings and admissions made during the bench trial are to be considered on remand.

¶ 38                    III. CONCLUSION

¶ 39    For the foregoing reasons, we reverse and vacate the trial court's judgments of July 28, 2023, and August 24, 2023.


¶ 40    Reversed and remanded.