LES VANLANDINGHAM *et al.*, d/b/a Newhouse Enterprises, Plaintiffs-Appellants, v. MARIA IVANOW *et al.*, Defendants-Appellees.

Fourth District   No. 4—92—0933

Argued May 19, 1993.—Opinion filed June 30, 1993.

Robert G. Kirchner (argued), of Lerner & Kirchner, of Champaign, for appellants.

Thomas E. Betz and John P. Popek, both of Student Legal Service, University of Illinois at Urbana-Champaign, of Urbana, for appellees.

JUSTICE McCULLOUGH delivered the opinion of the court:

Plaintiffs Lester (Les) and Martha Vanlandingham, d/b/a Newhouse Enterprises, filed a complaint in small claims court against Maria Ivanow, Thomas Tecza and Kenneth Gearin seeking $1,800 in past-due rent and reasonable attorney fees. Following a bench trial, the trial court entered judgment in favor of defendants, finding plaintiffs breached the implied warranty of habitability and the setoff due defendants because of this breach exceeded the amount of damages plaintiffs proved they sustained as a result of defendants' breach of the lease. Plaintiffs filed a motion for reconsideration, which was denied, whereupon they timely filed their notice of appeal. We affirm.

Defendants and Newhouse Enterprises, by Martha, entered into a lease agreement on May 14, 1988, in which defendants rented a house at 711 West California in Urbana, Illinois, for a monthly rent of $900. The period of the lease was August 15, 1988, to August 14, 1989.

Martha testified the house was in "fine shape" when defendants took possession. A deck was being built off of the living room, but other than that the interior of the house was clean and in good shape. Martha believed defendants were aware of the work in progress and stated they never asked for any repairs to be made prior to taking possession of the house.

The last rent payment Martha received from defendants was for the period of February 8 through March 15, 1989. Martha routinely telephoned defendants asking for the rent payment and defendants reassured her they would soon be paying the rent. She estimated that for approximately two months, defendants told her they would pay the rent but failed to do so. At the end of May 1989, Martha went to the house to see why defendants had not paid the rent and found it vacated. Martha had not received any notice of defendants' intent to vacate the house.

Upon inspecting the house after defendants had vacated, Martha found the bathroom dirty, damage to the plaster walls and ceilings (because of water damage), and missing screens. She at-

tempted to relet the house for the summer of 1989 but was unsuccessful. She did rent the house beginning in August 1989 for the next lease term at a monthly rent of $900.

On cross-examination, Martha testified that during the first four months of the lease, Gearin was to take care of any repairs to the house and since he never told her of any repairs, she presumed none were needed. Martha remembered receiving telephone calls in February 1989 from defendants expressing "general dissatisfaction" with the house but could not elaborate on the nature of the complaints. Martha claimed she answered "virtually all of" the telephone complaints from defendants.

Les characterized the house as being in "excellent condition" and testified it was "the nicest house I own." He could not recall anything specific that defendants had complained about or asked to be repaired upon their taking possession of the house.

When he inspected the house after defendants had vacated in May 1989, Les found it filthy and cluttered with a significant amount of physical damage. He found missing storm windows and screens, water damage on the living room and bedroom ceilings, and he found the kitchen "beyond cluttered" with food left in the refrigerator after the power had been shut off. He also found damage to the roof.

On cross-examination, Les could not remember any tenants other than Gearin contacting him to complain about conditions in the house. He indicated he told Gearin he wanted Gearin to specifically handle any complaints and this would be for the entire term of the lease. Les admitted there was a building code inspection done by the City of Urbana in May 1989 which found numerous code violations. Les testified he never received any complaints about opossums, raccoons, or rats being in the house. He also testified nobody complained to him that the basement flooded during a rainstorm, or that problems existed with the bathroom faucets. Les admitted the remodeling he was doing pertaining to the deck was still ongoing.

On redirect examination, Les admitted he received a phone call in the spring of 1989 from an employee who stated Gearin had called about the shower faucet leaking. At this time, as Les was incarcerated in the county jail, he was unable to respond to the call. He told his employee to tell Gearin to tell defendants to simply quit using the bathroom for the next couple of days and when he was released, he would come and attend to the problem.

Michael D. Nichols, the housing inspector for the City of Urbana, inspected the house on June 15, 1989. It took approxi-

mately half an hour to inspect the house and he found 43 building code violations. He characterized some of these code violations as "pretty serious" and indicated that if the property had not already been vacated, he would have considered ordering it vacated. Compliance with the building code was eventually made on April 2, 1990.

Gearin inspected the property the day before signing the lease. He characterized the house as "broom-clean" but found it was missing some fixtures in the attic area, the garage was not in a usable condition, the basement was not in a usable condition, the washer and dryer did not appear to be in a usable condition, the house was in need of paint and there were screens missing on the porch. Gearin also noted the deck off of the living room was not completed. He indicated he had a verbal agreement with Martha that the deck would be finished before the tenants took occupancy and that other repairs would be made.

According to Gearin, the first problem defendants had with the house was with the washer and dryer not working correctly. He fixed the washer and dryer several times and was paid for those repairs by plaintiffs. These repairs took place in November 1988. During the first six months of the lease, defendants made several requests to have the deck completed because it was dangerous as there was a hole approximately two feet wide off of the living room door to the deck which a person could fall through to the ground. There was no railing around the deck and Gearin put up a makeshift railing to make it safe.

Gearin also indicated they had a severe roof leak which they requested be repaired because it was causing water damage in one of the bedrooms. It took approximately four to six hours to fix the roof and he was assisted in that repair by another of plaintiffs' employees. On the second floor, there was a problem with the bathroom faucets because the hardware on the pipes popped out and sprayed water all over the bathroom. This occurred in October or November 1988 and was the first time defendants had water damage. Gearin reported this problem to Les but he did not come over and make the repairs. Gearin made temporary repairs himself. He did not receive compensation for these repairs.

The bathroom flooded a second time and the other tenants could not find the shutoff valve for the water because it was hidden in the corner of the basement by all types of debris. Gearin had to be called from class to come and shut off the water. In the meantime, water was running full blast and that was when the major damage

occurred to the walls, living room area downstairs, and the ceilings. Gearin spoke to Martha, who told him to get the parts, to fix the faucet, and he would be reimbursed. He attempted to repair the pipes and the faucet and cement the pipe back into the wall. After the second occurrence, defendants were unable to use the shower but could only use the toilet in that bathroom.

As a result of the roof leak, there was damage to the ceiling in one of the bedrooms, which Gearin attempted to fix. The refrigerator sporadically broke down and had to be taken apart, the fan allowed to defrost, and then be reassembled. There were complaints regarding the basement flooding any time it would rain and a gas leak in the winter of 1988. Gearin testified there were numerous rats and opossums in the basement and kitchen and he had killed four to five rats, two opossums, and shot at many more that he did not kill. He complained about the rodents, but plaintiffs failed to send over an exterminator. On the first floor, there was a broken window without a frame, the porch was in need of repair and other screens were missing.

Gearin stated they stopped paying rent in early March 1989 because that was the only way they were going to get anything done. He explained that they had made numerous phone calls and tried to get the repairs completed but plaintiffs would either not return the phone calls or refuse to make the repairs. Defendants believed that by withholding rent, they could force plaintiffs to make the repairs. Defendants did not call the building inspector prior to withholding payment and moving out because they felt they would be evicted immediately upon inspection and they had no other place to stay.

Gearin stayed in the house approximately one week after the others had vacated and he came back and attempted to clean the place. He cleaned out the refrigerator, turned off the electricity, and made other repairs. Gearin took several photographs of the damaged areas of the house. These pictures showed the uncompleted deck, the roof damage, the debris in the basement, the hole in the foundation of the house where the rodents were entering the basement, the water damage to the ceilings and walls and the exposed electrical wires in the basement of the house. Gearin estimated they only had approximately 40% to 50% of usable space in the house.

On cross-examination, Gearin opined the house was not delivered to the tenants in good condition. He indicated he believed good condition would be furnished with the items which were listed on the lease, which the house was not, *e.g.,* a functional washer and

dryer, and he believed good condition would include being able to use 100% of the premises, which they were unable to do. Gearin reaffirmed that he asked Martha, prior to their taking occupancy, to make certain repairs.

Ivanow testified that when she first inspected the property prior to taking occupancy, she found the interior to be generally good, but there were things she would describe as incomplete, including missing lighting fixtures in the upper bedroom, missing screens, fractured windows, and the incomplete deck. She was told the deck was under construction and not to worry since it would be taken care of before they moved into the house. She was also told a fire escape would be completed from the third-floor bedroom. She stated the washer and dryer in the house were not functioning properly and she had no heat in her bedroom in October 1988. She complained about the lack of heat to Les, who told her that he was unable to come over and fix the heat because his dogs were sick. Ivanow saw a rat in the house during the first two weeks of the lease; a raccoon was trapped during the winter months; and in the late fall, she saw animal feces in the basement which had been deposited by two opossums. She indicated she cornered one of the opossums with a box, trapped it, and eventually let it go in the forest. She indicated they decided to withhold rent in March 1989 because the telephone calls regarding complaints they had made to plaintiffs were unsuccessful in getting the necessary repairs made. They did not consider calling the building inspection division because they were afraid of being evicted when the inspection was made and they had no other place to live. It was her opinion that they only had approximately 40% of usable space in the house.

Tecza inspected the premises prior to taking occupancy and he saw the incomplete deck, the missing fire escape from the bedroom, the missing screens, and the nonfunctional washer and dryer. He testified Martha told them at the time of the inspection that these things would be repaired upon their taking occupancy. Tecza testified that had he known the repairs they had been promised were not going to be made, he would not have entered into the lease or moved into the place.

Tecza stated there were no screens on some of the windows, there were no storm windows and there was a missing light fixture in his bedroom. There also were exposed wires in his bedroom, as well as a hole in both the foundation and the soffit where raccoons would enter the house. He reiterated the fact that the roof leaked, causing water damage into the other bedroom, and that complaints

about all these problems were made to plaintiffs. The second-floor bathroom cold water knob in the shower had exploded, causing severe water damage to the house; he told Martha about this water damage, but she refused to make any repairs. He also indicated problems with the kitchen faucet not working, the stove and refrigerator not working correctly, and flooding in the basement. Tecza personally saw rats and raccoons in the house and he could hear the raccoons scratching on the walls of his bedroom. He estimated that 40% to 50% of the house was unusable.

In rebuttal, Les testified he never received any complaints or contacts from defendants asking him to make any of the repairs they described. He indicated that he certainly would have recalled complaints about a lack of heat or rodents in the house. He noted a muddy area in the basement which could have been caused by flooding in that area. Les denied ever promising them a date for the completion of the deck. Les screwed the door from the living room to the deck shut so people could not enter the deck because it was missing the railing. Martha denied ever being contacted by any of defendants regarding water or rodent problems.

The trial court took the matter under advisement and later made the following docket entry:

"Decision on cause heretofore taken under advisement. The evidence presented at trial established that numerous, serious building code violations existed in the residence which Defendants rented from Plaintiffs throughout the term of Defendants' tenancy. The building code violations constituted a breach by Plaintiffs of the warranty of habitability implied into [sic] the lease which they entered into with Defendants. The value to Defendants of their leasehold was diminished to the extent of 50% due to Plaintiffs' breach of the implied warranty of habitability. The setoff due to Defendants by reason of Plaintiffs' breach of the implied warranty of habitability exceeds the damages which Plaintiffs proved they sustained as a result of Defendants' breaches of the parties' lease agreement. Finding in favor of Defendants and against Plaintiffs. Judgment entered in favor of Defendants and against Plaintiffs. Plaintiffs' Complaint is ordered dismissed, with prejudice, and stricken. Parties notified of the Court's decision by mail."

Plaintiffs filed a motion for reconsideration. The trial court noted it heard extensive evidence on the issues and found an extensive number of building code violations existed at the time the ten-

ants took possession of the house and at various stages during the entire period of lease. The trial court noted supreme court authority about this issue and specifically found that building code violations existed which deprived the tenants of the use and benefit of the contract and which were not caused by the tenants. It found proper notice was given and that the appropriate repairs were not made. Based on those facts and the court's analysis of the evidence, the motion for reconsideration was denied. This appeal followed.

Plaintiffs first allege the trial court erred in finding in favor of defendants under a theory of breach of implied warranty of habitability because defendants failed to plead a breach of that warranty as an affirmative defense. Defendants contend they did not have to plead this as an affirmative defense because they complied with supreme court rules regarding complaints filed in small claims court.

■■ Supreme Court Rule 281 provides that a small claim is a civil action based on either tort or contract for money not in excess of $2,500. (134 Ill. 2d R. 281.) Since the prayer for relief of plaintiffs' complaint only sought $1,800, this was properly filed in small claims court. Supreme Court Rule 286(a) (134 Ill. 2d R. 286(a)) provides:

> "[T]he defendant in a small claim must appear at the time and place specified in the summons and the case shall be tried on the day set for appearance unless otherwise ordered. If the defendant appears, he need not file an answer unless ordered to do so by the court; and when no answer is ordered the allegations of the complaint will be considered denied and any defense may be proved as if it were specifically pleaded."

Defendants suggest that under this rule, the trial court properly considered the affirmative defense of breach of the implied warranty of habitability even though it was not specifically pleaded. Defendants refer to *Wroclawski v. Waszczyk* (1976), 35 Ill. App. 3d 408, 342 N.E.2d 261, for support. There, plaintiff filed a small claims complaint seeking damages in the amount of $800 plus interest. Defendant filed an appearance but no answer. The court held defendant did not waive his right to assert an affirmative defense because he did not file an answer, nor was he ordered by the court to do so. Thus, pursuant to Supreme Court Rule 286, he was not precluded from asserting the defense, nor was the trial court barred from considering the defense. *Wroclawski*, 35 Ill. App. 3d at 412, 342 N.E.2d at 264.

As plaintiffs note, however, defendants here filed an answer specifically pleading three other affirmative defenses. Because of our determination as to the propriety of the breach of implied warranty of habitability defense which follows, we need not determine whether defendants were required to file the written affirmative defense because an answer was filed.

■ The facts constituting any affirmative defense which would likely take the opposite party by surprise must be plainly set forth in the answer. (Ill. Rev. Stat. 1989, ch. 110, par. 2—613(d).) The failure to state such facts so waives the asserted defense and it cannot be considered even if the evidence suggests the existence of such a defense. (*Spagat v. Schak* (1985), 130 Ill. App. 3d 130, 134, 473 N.E.2d 988, 992.) The test of whether a defense is an affirmative defense and must be pleaded is whether the defense gives color to the opposing party's claim and then asserts new matter by which the apparent right is defeated. The admission of the apparent right is inferable from the affirmative defense. *Space v. E.F. Hutton Co.* (1989), 188 Ill. App. 3d 57, 59, 544 N.E.2d 67, 69.

■ Under this analysis, breach of the implied warranty of habitability is an affirmative defense which must be pleaded and plainly set forth in the answer. Under the defense:

"The tenant is liable only for the fair rental value of the defective premises during the period of the breach of the implied warranty and is entitled to an abatement of rent in excess of that amount. If the full rent has been paid for a period for which the tenant is entitled to an abatement, damages may be awarded in his favor in that amount." *Glasoe v. Trinkle* (1985), 107 Ill. 2d 1, 17, 479 N.E.2d 915, 922.

By asserting this defense, a defendant would acknowledge that past rent is due but that the defendant is either entitled to an abatement of that rent or damages because of the excess rent already paid during the period of the breach of the implied warranty. The defense "gives color" to the landlord's claim for rent but asserts new matter which defeats that right. Thus, it must be characterized as an affirmative defense and specifically pleaded as such.

■ Normally, defendants would thus not be able to assert this defense because of a failure to specifically plead it. However, we conclude plaintiffs have waived all objections to defendants' failure to plead this affirmative defense by their failure to object at trial.

A review of the record on appeal reveals that defense counsel's theory throughout the trial was that plaintiffs breached the implied warranty of habitability because of the numerous building code vio-

lations and general poor condition of the house. Plaintiffs' attorney did not object to any questions by defense counsel regarding the conditions of the house and, in fact, extensively cross-examined each defendant about the nature and extent of the defects. Defense counsel specifically asked each defendant the percentage reduction of the usable portion of the house, which clearly is a measure of the damages for breach of the implied warranty of habitability. (*Glasoe*, 107 Ill. 2d at 16, 479 N.E.2d at 921.) Furthermore, during closing argument by defense counsel, the implied warranty and the subsequent breach were specifically mentioned, and plaintiffs' attorney failed to object and failed to respond in rebuttal to this argument. On the motion for reconsideration, plaintiffs specifically discussed the implied warranty of habitability.

In *Truchon v. City of Streator* (1979), 70 Ill. App. 3d 89, 388 N.E.2d 249, the court noted plaintiffs had challenged defendant's failure to raise the affirmative defense of *laches* in her answer. The court responded:

> "On appeal plaintiffs have challenged the failure of [defendant] to raise the affirmative defense of laches in her answer. It is sufficient to respond to plaintiffs' contention to note that both plaintiffs' and [defendant's] counsel argued the issue on its merits to the trial court and the trial court did in fact render a decision on such issue. Having failed to raise in the first instance any objection to the failure to properly plead the affirmative defense of laches, and then proceeding to argue this same issue to the trial court, the plaintiffs have waived all objection to any procedural insufficiency." *Truchon*, 70 Ill. App. 3d at 94, 388 N.E.2d at 253.

Therefore, in accordance with *Truchon*, plaintiffs have waived any objection to the failure to plead this affirmative defense. Plaintiffs did not object, in the first instance, to any failure to properly plead the affirmative defense, proceeded to argue this issue in the trial court as well as in the motion for reconsideration, and on appeal before this court.

Plaintiffs next offer alternate arguments in support of their final contention that the trial court erred in finding in favor of defendants. First, plaintiffs contend the trial court found, as a matter of law, that the violations of the building code provisions constituted a *per se* breach of the implied warranty of habitability. Plaintiffs assert the trial court must consider the factors set forth in *Glasoe* and cannot simply conclude that the building code violations equal a *per se* breach. Alternatively, plaintiffs contend the trial

court's decision was against the manifest weight of the evidence and arbitrary and capricious because it accepted defendants' testimony regarding the diminution in value of the house without a sufficient factual background to support their testimony.

■ The implied warranty of habitability requires that a dwelling be fit for its intended use; that is, it should be habitable and fit for living. The warranty also requires that at the inception of the lease there be no latent defects in those facilities vital to the use of the dwelling for residential purposes and vital to the life, health, and safety of the tenant and that the premises will remain habitable throughout the term of the lease. (*Glasoe*, 107 Ill. 2d at 13, 479 N.E.2d at 919-20.) The warranty is to be implied in leases of single-family dwellings as well as leases of multiple-unit dwellings. *Pole Realty Co. v. Sorrells* (1981), 84 Ill. 2d 178, 182, 417 N.E.2d 1297, 1300.

■ In order to constitute a breach of the implied warranty of habitability, the defect must be of such a substantial nature as to render the premises unsafe or unsanitary and, thus, unfit for occupancy. A landlord is not required to insure that the dwelling is in a perfect or aesthetically pleasing condition. Not every defect or inconvenience will be deemed to constitute a breach of the covenant of habitability. Whether there has been a breach of the warranty is a question of fact to be determined on a case-by-case basis. (*Glasoe*, 107 Ill. 2d at 13, 479 N.E.2d at 920.) The simple fact that a house can be inhabited does not necessarily mean that the warranty of habitability has been satisfied. *Pole*, 84 Ill. 2d at 183, 417 N.E.2d at 1300.

In determining whether there has been a breach of the implied warranty, the courts have considered various factors, including the nature of the deficiency, its effect on habitability, the length of time it persisted, the age of the structure, the amount of the rent, the area in which the premises are located, whether the tenant waived the defects, and whether the defects resulted from abnormal or unusual use by the tenant. The condition complained of must be such as to truly render the premises uninhabitable in the eyes of a reasonable person. In addition to the guidelines stated, there must, of course, be notice of the alleged defects given by the tenant to the landlord and the landlord must have had a reasonable time within which to correct the alleged deficiencies. *Glasoe*, 107 Ill. 2d at 14, 479 N.E.2d at 920.

■ Damages for breach of the implied warranty of habitability can be measured in one of two ways. The "percentage reduction in

the use" approach reduces the tenant's rent by a percentage reflecting the diminution in the value and enjoyment of the premises by reason of the existence of defects which give rise to the breach of the implied warranty of habitability. (*Glasoe*, 107 Ill. 2d at 16, 479 N.E.2d at 921.) Since both sides would ordinarily be intimately familiar with the conditions of the premises, both before and after the breach, they are competent to give their opinion as to the diminution in value occasioned by the breach. In ascertaining damages, the finder of fact must weigh the severity of the violation and the duration of the conditions giving rise to the breach, as well as the effectiveness of steps taken by the landlord to abate those conditions. *Glasoe*, 107 Ill. 2d at 17, 479 N.E.2d at 921-22.

The tenant is liable only for the fair rental value of the defective premises during the period of the breach of the implied warranty and is entitled to an abatement of rent in excess of that amount. If the full rent has been paid for a period for which the tenant is entitled to an abatement, damages may be awarded in the tenant's favor in that amount. The agreed rent may be considered by the court as evidence of the fair rental value. *Glasoe*, 107 Ill. 2d at 17, 479 N.E.2d at 921.

■ Plaintiffs first allege the trial court merely found, as a matter of law, that building code violations equaled a breach of the implied warranty of habitability and failed to consider the factors set forth in *Glasoe*. Although the trial court did not specifically enumerate the factors in *Glasoe* and explain how they applied to the facts of this case, it did consider those factors. The trial court was presented with evidence regarding (1) the nature of the deficiencies, (2) the effect on the habitability, (3) the length of time the deficiencies persisted, (4) the amount of rent, (5) the area in which the premises were located, and (6) whether the defects resulted from abnormal or unusual use by the tenants. Thus, plaintiffs' argument on this point is without merit.

■ Alternatively, plaintiffs assert the trial court's decision was against the manifest weight of the evidence and arbitrary and capricious. Without reciting the facts previously stated, the trial court's decision was not against the manifest weight of the evidence. The evidence clearly supported the conclusion that plaintiffs breached the implied warranty of habitability. There was testimony from all three defendants pertaining to rats, opossums, and raccoons invading the house. There were dangerous conditions in the exposed wires, the uncompleted deck with the missing railing, and the gaping hole outside the door to the deck. The appliances pro-

vided for in the lease did not function properly, the roof leaked, the basement flooded, and the bathroom on the second floor was substantially unusable. Ivanow had no heat in her bedroom in October. Moreover, there were in fact 43 building code violations, which are some evidence of the inhabitability of the premises. Plaintiffs presented no evidence to contradict defendants' testimony that these deficiencies existed in the house, and while plaintiffs denied that various complaints had been made, the trial court evidently chose to believe defendants' testimony and was within its province in doing so. All of these defects made the house unsafe, unsanitary, and thus unfit for occupancy.

Defendants proved their damages by using the "percentage reduction in the use" method. As noted, this approach reduces the tenants' rent by a percentage reflecting the diminution in value and enjoyment of the premises by reason of the existence of the defects which give rise to the breach of the implied warranty of habitability. The trial court found defendants' value of the leasehold was diminished to the extent of 50% and the breach existed for the entire term of the tenancy. The total rental value for the property was $10,800 (12 months x $900-per-month rent). Reducing this amount by 50%, defendants were only liable for $5,400 in rent. Defendants paid for seven months rent at $900 per month, totaling $6,300. Thus, the amount of rent defendants paid exceeded the amount they were required to pay and, therefore, their damages exceeded the amount of damages sought by plaintiffs.

■■ Finally, plaintiffs suggest defendants were unqualified to give testimony regarding the nature of the defects and the diminution in value of the house; however, the language in *Glasoe* specifically states the parties are competent to testify regarding the diminution of the value occasioned by the breach because of the fact they resided in the property both before and after the breach occurred. Obviously, the tenants residing in the house are best qualified to testify as to the diminution in value of the house.

For the foregoing reasons, the judgment of the circuit court of Champaign County is affirmed.

Affirmed.

STEIGMANN, P.J., and KNECHT, J., concur.